**ALABAMA–COUSHATTA TRIBE OF TEXAS (Fulton Battise, Chief of the Tribal Council, and all other enrolled members of such tribe), Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Cong. Ref. No. 3–83.**

United States Court of Federal Claims.

April 8, 1993.

Don B. Miller, Boulder, CO, for plaintiff. Jerilyn DeCoteau, Tom Diamond, Alan Minter and Jeffrey M. Glosser, of counsel.

David F. Shuey, Washington, DC, for defendant. Patricia L. Weiss, Washington, DC, of counsel.

## SUPPLEMENTAL REPORT OF SUBSTITUTE HEARING OFFICER

TURNER, Hearing Officer.

This congressional reference involves the claim of an American Indian tribe for compensation for loss of lands which it once occupied in eastern Texas. The case was initiated on November 29, 1983 pursuant to House Resolution 69 (98th Cong.). Pursuant to said resolution, the House of Representatives referred the claim of the Alabama–Coushatta Tribe of Texas to the chief judge of this court[1] for proceedings in accordance with sections 1492 and 2509 of title 28, United States Code.[2] Plaintiff's complaint was filed on February 22, 1984.

Senior Judge Mastin White, now deceased, was duly appointed as hearing officer; he conducted a trial and submitted his report on May 29, 1987, concluding that the tribe was not entitled to compensation. *Battise v. United States,* 12 Cl.Ct. 426 (1987). (See Appendix A to this report for description of proceedings conducted by Judge White and reaction to his report by the review panel.)

Upon consideration of exceptions to the hearing officer's report, the review panel, without modifying any finding of fact or conclusion of law made by the hearing offi-

cer, remanded the case for reconsideration. Judge White had died shortly after issuing his 1987 report, and the chief judge appointed the undersigned as substitute hearing officer. *See* Appendix A.

The undersigned issued a report on March 8, 1991, the text of which is set forth in Appendix A. Upon consideration of that report, the review panel determined that additional findings of fact were needed. (See Appendix B to this report for text of the panel's Supplemental Remand Order dated May 23, 1991.) The matter stands on the review panel's directive to make supplemental findings. *See* Appendix B.

## I

In its complaint, the tribe alleges that it has aboriginal or Indian title over a vast piece of land in eastern Texas, that it lost possession and use of this land due to the gradual encroachment of non-Indian settlers and that the United States government breached its duty to protect the tribe in possession of its aboriginal lands.[3] Although the tribe initially alleged entitlement to compensation for loss of approximately 9 million acres comprising all or part of 17 Texas counties (the original claim area), it has reduced the scope of its claim to approximately 6.4 million acres comprising all or part of the area now included in 12 Texas counties (the modified claim area).[4]

The government contends that the tribe has failed to satisfy the test for aboriginal title and, alternatively, that if aboriginal title is established, then it was extin-

---

**1.** Effective October 29, 1992, Congress renamed the United States Claims Court the "United States Court of Federal Claims." Federal Courts Administration Act of 1992, Pub.L. No. 102–572, §§ 902, 911, 106 Stat. 4506, 4516, 4520.

**2.** The reference originally involved claims of two separate but historically related American Indian tribes—the Alabama–Coushatta Tribe of Texas and the Coushatta Tribe of Louisiana. The tribes litigated their cases separately. For a brief history of proceedings related to that separate claim, see *Battise v. United States,* 12 Cl.Ct. 426, 427 (1987).

**3.** The tribe's theory is that it currently has aboriginal title to these lands and is seeking com-

pensation from the federal government for failure to protect it in its possession of the lands. Alternatively, the tribe contends that the encroachment amounted to a taking by the government.

**4.** In its Proposed Findings of Fact and Conclusions of Law, filed May 26, 1992, the tribe reduced the area over which it asserts aboriginal title. The 12 counties that comprise the modified claim area include: Montgomery, Walker, Angelina, Hardin, Jasper, Liberty, Newton, Orange, Polk, San Jacinto, Trinity and Tyler.

guished prior to the date that United States sovereignty attached.

## II

The tribe's pursuit of relief for loss of this land is marked by an extensive procedural history. In 1969, the tribe sought to intervene in Docket No. 226, *Caddo Tribe of Oklahoma v. United States* before the Indian Claims Commission (ICC), asserting a claim pursuant to the Indian Claims Commission Act of 1946 (now codified, as amended, at 25 U.S.C. §§ 70 through 70v–3). The ICC initially permitted the tribe to intervene. *Caddo Tribe of Oklahoma v. United States*, 17 Ind.Cl.Comm. 8 (1972). Several years later, based on intervening changes in the law, the ICC dismissed the tribe's claim, concluding that intervention was improper and that the tribe had failed to timely file.[5] *Caddo Tribe of Oklahoma v. United States*, 35 Ind.Cl.Comm. 321, 328 (1975). Before the claim was dismissed, the ICC conducted a trial on the government's liability, at which the tribe submitted documentation and testimony to establish its claim of aboriginal title. Although the ICC dismissed the tribe's claim, it noted that "the Alabamas and Coushattas had established extensive areas of use and occupancy which they continued to inhabit for a long time." *Id.* at 351. The ICC also noted that "for a long time beginning before and ending after the United States acquired these areas the Alabamas and Coushattas effectively exercised control over these areas and over other Indians who may have ventured therein." *Id.*

Following the claim's dismissal, the tribe sought a jurisdictional act from Congress, asserting that, contrary to an explicit directive of the Indian Claims Commission Act, the tribe was not notified of its enactment or of the need to assert claims against the United States on a timely basis. Subsequently, the House of Representatives referred H.R. 1232, 98th Cong., 1st Sess. (1983), to this court. If enacted, H.R. 1232 would authorize the Secretary of the Treasury to pay the Alabama–Coushatta Tribe of Texas[6] an appropriate sum

> in full settlement of [1] all claims of [said tribe] arising from the taking by the United States of land owned or occupied by such [tribe] without payment for such lands of compensation agreed to by such [tribe], and *[2] claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity*, and [3] other claims which otherwise, except for the lapse of time and the failure to timely file, would have been compensable under the Indian Claims Commission Act, [25 U.S.C. § 70 (1976 ed.)].

(Emphasis added.)

The tribe filed its complaint in this court on February 22, 1984. In due course, Judge White conducted a four-day trial, during which he heard the live testimony of three expert witnesses and the deposition testimony of three other witnesses, and thereafter submitted his report on May 29, 1987. *Battise v. United States*, 12 Cl.Ct. 426 (1987). The report set forth detailed findings of fact and conclusions of law and ultimately concluded that the tribe did not have a legal or equitable claim against the government. *Id. See* Appendix A.

---

5. The Indian Claims Commission Act, 25 U.S.C. § 70k, set forth a five-year limitations period to expire August 13, 1951 for claims under the Act. The tribe did not comply with that provision. Nonetheless, the tribe sought to intervene in the Caddo tribe's case which also involved lands in Texas. Then, in 1973, in *United States v. Kiowa, Comanche and Apache Tribes of Indians*, 202 Ct.Cl. 29, 43, 479 F.2d 1369, 1377 (1973), the Court of Claims held that a tribe whose claim was barred by the statute of limitations could not intervene in an action where the tribe's interests were in direct conflict with those of the original claimants.

6. The referral to this court of H.R. 1232 (98th Cong.) authorized proceedings regarding both the plaintiff tribe and a related but separate tribe named Coushatta Tribe of Louisiana. These two tribes filed separate complaints and litigated their claims independently of each other. The report of the hearing officer and the approving report of the review panel regarding the claim of the Coushatta Tribe of Louisiana had been submitted to the House of Representatives before Judge White's May 29, 1987 report in this case. *See Battise*, 12 Cl.Ct. at 426–27 & n. 1.

The tribe filed exceptions to the hearing officer's report which were briefed and argued before a review panel. On May 30, 1990, the review panel issued an order stating that "Judge White had improperly applied the law on at least one critical issue, failed to address certain legal issues, and also failed to find the facts specially on several factual issues." The review panel remanded the case for reassignment to a substitute hearing officer. *See* Appendix A.

The government filed a motion for reconsideration of the order because it did not provide sufficient guidance to a new hearing officer. On August 6, 1990, the review panel denied the government's motion. The review panel stated that it had been unable to construct its own findings of fact and conclusions of law and, therefore, that "the entire matter could be properly resolved only by remand of the case to a new Hearing Officer." *See* Appendix A.

The chief judge appointed the undersigned as substitute hearing officer on February 7, 1991. On March 8, 1991, we issued our initial report indicating that a substitute hearing officer could not lawfully proceed under the remand order until the review panel affirmed or modified Judge White's findings and conclusions as required by 28 U.S.C. § 2509 and RCFC, Appendix D, ¶ 10. *See* Appendix A.

The tribe filed a notice of intention to except from that report, and, by order dated April 12, 1991, the review panel declined to hear the tribe's exceptions but nonetheless set a hearing to air the tribe's concerns. On May 23, 1991, the review panel issued a supplemental remand order holding that there was no impediment to a remand. *See* Appendix B. The review panel said that Judge White "failed to make indispensable factual findings addressing various critical fact issues without which the panel is left to speculate whether the law has been properly applied." And

further, "[T]he primary reason for the remand was that he 'failed to find the facts specially on several factual issues.'" The order then directed the undersigned to make factual findings on a lengthy list of issues that were set out in the order. *See* Appendix B.

On July 8, 1991, the tribe filed a motion for supplemental trial, contending that RCFC 63 and 52(a) had been construed to require a new trial in similar circumstances. We denied this motion in open court on December 11, 1991. On December 12, 1991, we issued an order (renewing the requirements of an order entered on June 6, 1991) directing the parties to submit briefs on the following issues:

1. Whether the tribe had established aboriginal title to any portion of the claim area prior to December 29, 1845.

2. What are the facts relating to the tribe's delay or laches in presenting its claim.

3. What are the facts bearing upon the question whether the bar of any statute of limitations otherwise applicable to the tribe's claim should be removed.

4. What are the facts claimed by the tribe to excuse it for not having resorted to any established legal remedy such as the remedy available under the Indian Claims Commission Act of 1946.[7]

Oral argument concerning these issues was conducted on March 3, 1993. We conclude that the Alabama–Coushatta Tribe of Texas had established aboriginal title to a portion of the lands claimed by 1830 but that at no time did the tribe establish aboriginal title to the remaining portion of the modified claim area. Further, we conclude that neither the doctrine of laches nor any statute of limitations should bar the tribe's claim.

### III

■ Following a trial and submission of post-trial briefs, Judge White issued a re-

---

7. Although the review panel requested factual findings on approximately 40 issues, *see* Appendix B, this report is limited to resolution of the four issues specified in the text. Our findings resolve all questions related to the establishment of aboriginal title and all questions related to the passage of time to the extent possible given the nature of this claim. We decline to address issues related to the extinguishment of aboriginal title until the review panel affirms or modifies Judge White's holding regarding extinguishment.

port denying compensation to the tribe and concluding that even if the tribe could prove that it had aboriginal title to the claim area,[8] such title was extinguished prior to the time that United States sovereignty attached. *Battise v. United States,* 12 Cl.Ct. 426, 433–34 (1987). Judge White's report includes detailed factual findings that are entitled to deference.[9] Hence, Judge White's report should be the point of departure for any additional findings.

This part of the opinion will discuss the findings of Judge White that are relevant to the issue of establishment of aboriginal title. See *Battise v. United States,* 12 Cl.Ct. 426, 428–32 (1987), for a more detailed discussion of the facts as found by Judge White. In addition, we make such supplemental findings as are necessary to decide whether the tribe had aboriginal title to all or any portion of the claim area at any time before United States sovereignty attached.

### A. *Entry into Texas*

The Alabama–Coushatta Tribe of Texas is presently comprised of approximately 500 members of Alabama and Coushatta descent residing on a 4,200 acre reservation in Polk County, Texas, near the town of Livingston. *Battise v. United States,* 12 Cl.Ct. 426, 428 (1987).

Until 1859, the Alabamas and Coushattas were separate tribes although they intermarried, spoke similar languages and generally acted as one people. *Id.* Beginning in 1859, the two tribes began to share the same reservation. *Id.* at 432.[10]

The first recorded European contact with these Indians was by the Spanish explorer, Hernando De Soto, and the members of his expedition, who visited the Alabamas and Coushattas during an exploration of the Mississippi River Basin in 1540–41. *Id.* at 428. At that time, the Alabamas were located in the northern part of what is now Mississippi, and the Coushattas were living on an island in the Tennessee River. *Id.* By the end of the seventeenth century, both the Alabamas and Coushattas lived within what is now Alabama. *Id.*

The first serious disruption of French control over the vast Louisiana Territory came during the French and Indian War, a phase of the Seven Years' War. In 1763, France ceded to Spain the portion of this territory lying west of the Mississippi River (which included most of present-day Louisiana and vast areas to the north and northwest thereof) and ceded to Great Britain the portion of this territory lying east of the Mississippi River (which included present-day Alabama and Mississippi and vast areas to the north thereof). Subsequently, by the Treaty of San Ildefonso in 1800, Spain ceded back to France the portion of the Louisiana Territory west of the Mississippi River.

The Alabamas and Coushattas were pro-French tribes; consequently, most of them

---

**8.** Unless specified otherwise, all references to the "claim area" refer generally to the region of land in eastern Texas to which the tribe claims aboriginal title. One may assume any such reference applies both to the original 17–county claim area and to the modified 12–county claim area. Only where the precise boundaries become relevant do we refer to the "original claim area" or the "modified claim area."

**9.** It is true that the law-of-the-case doctrine "merely requires a trial court to follow the rulings of an appellate court" and "does *not* constrain the trial court with respect to issues not actually considered by an appellate court," *Exxon Corp. v. United States,* 931 F.2d 874, 877 (Fed.Cir.1991), and further, that this principle does not "require the trial court to adhere to its own previous rulings if they have not been adopted, explicitly or implicitly, by the appellate court's judgment," *id.* "Nor is the legality of the

[trial court's] revision of its previous findings in any way affected by the fact that the revision was by a different trial judge." *Id.* at 878. Nonetheless, although a trial judge has power to reconsider his own previous rulings (or those of a different trial judge), it is appropriate for such a judge to decline to reconsider matters once they have been decided. *See* 18 Charles A. Wright et al., *Federal Practice and Procedure* § 4478 (1981); *see also* 1B James W. Moore et al., *Moore's Federal Practice* ¶ .404 (2d ed. 1992) (noting that "utility ... would be seriously compromised if the fact of transfer were to be treated as an invitation to seek a 'second opinion' on every pre-transfer ruling").

**10.** Section 732 of title 25, United States Code, provides: "The Alabama and Coushatta Indian Tribes of Texas shall be considered as one tribal unit for purposes of this subchapter and any other law or rule of law of the United States."

left Alabama in 1763 to avoid British authority and began a slow migration westward. *Battise*, 12 Cl.Ct. at 428. By the end of the eighteenth century, the Alabamas and Coushattas were established in the western portion of what is now Louisiana. *Id.*

The precise date of the initial entry into Texas of the Alabamas and Coushattas has not been ascertained. Judge White found that at least by the year 1800, the Alabamas and Coushattas began to slowly migrate into Texas, which was then Spanish territory. *Id.* Alabama and Coushatta presence in Texas is first documented by the Spanish in the early 1800's.[11] Although the tribe asserts that its predecessors were in Texas from the 1780s, we find that Alabama and Coushatta migration began slowly around 1800.

When the Alabamas and Coushattas began to migrate into Texas, the claim area was primarily covered by forests, but there were some open prairies, and the area contained many types of wild game. *Battise*, 12 Cl.Ct. at 428. The soil was fertile and suitable for farming when cleared with the exception of an area called the Big Thicket.[12] *Id.* at 428–29.

Judge White found that the Louisiana Purchase was a significant factor increasing the pace of the Indian migration to Texas. *Id.* at 429. In 1803, in the Louisiana Purchase, the United States acquired from France, *inter alia*, the portion of Louisiana west of the Mississippi River that France had reacquired from Spain. At that time, Spain's military force in Texas consisted of about 300 men who were primarily concerned with possible incursions from the United States into the region. *Battise*, 12 Cl.Ct. at 429. The only non-Indian settlements in the area in 1803 were a Spanish military garrison and trading post in what is now Nacogdoches County.[13] *Id.* One Spanish report shows that there were 791 non-Indian settlers in the entire Nacogdoches District. DX 8.[14]

As a result, Spain encouraged friendly Indian tribes to settle along the Texas side of the Texas–Louisiana border, to serve as a buffer against possible American aggression. *Battise*, 12 Cl.Ct. at 429. Despite a fear that the admission of Indians from Louisiana would disturb the peaceful nature of the indigenous Texas Indians, Spain permitted the Tensas Tribe to enter in 1804, and shortly thereafter, the Alabamas and Coushattas used this decision as a precedent to secure lawful admission. DX 7.

Likewise, the Louisiana Purchase strengthened the desire of the Louisiana Indians to migrate to Texas and thereby avoid the presence of Anglo–Americans. By the end of the first decade of the nineteenth century, about 350 Alabama and Coushatta men, and their families, had migrated into Texas and created extensive settlements in the claim area.[15] *Battise*, 12 Cl.Ct. at 429.

---

**11.** For instance, the Spanish report that in January 1804, a band of Alabamas raided Nacogdoches, DX 7, that in August 1804, the Alabamas came to Nacogdoches to receive supplies, PX 14 & 15; DX 7, and that the Alabamas also appeared at Nacogdoches to receive gifts, DX 7. These are among the earliest references to Alabama and Coushatta presence in Texas.

**12.** The Big Thicket was a forest located in what are now Polk and Hardin Counties. The Big Thicket contained many species of trees, and many types of undergrowth lived beneath the trees. The Big Thicket was virtually impenetrable. Nevertheless, it was rich in wildlife, which made it an optimal place for hunting for the Indians in southeast Texas. *Battise* at 429.

**13.** In 1805, the Spanish established a military post at the intersection of the Atascosito Road and the Trinity River. Tr. 349–50, 510. The Atascosito post was abandoned by 1819. Tr. 351. Also in 1805, the Spanish created a civilian town called Salcedo de Trinidad at the intersection of the Camino Real and the Trinity River. Tr. 350; DX 11. A census from 1809 shows that the town had approximately 90 residents. DX 16.

**14.** For ease of reference, the following abbreviations for document references are used in this opinion:

   a. "PX _" refers to plaintiff's Exhibit No. _.
   b. "DX _" refers to defendant's Exhibit No. _.
   c. "Tr. _" refers to transcript pages pertaining to the trial conducted by Judge White on August 20–22 and October 1, 1986.

**15.** An 1809 report by Davenport, a trader, lists populations for Indians in Texas. This report shows 200 Alabama men and 150 Coushatta men in Texas. PX 53. The total population of the Alabamas and Coushattas was probably a

Judge White found that there were settlements "along the lower Sabine River, along the Trinity River (as far north on the Trinity as Salcedo and as far south as Atascosito), near the San Jacinto River, on the Neches River, between the Neches and the Trinity Rivers, on the Attoyac Bayou, and along the Opelousas Road." *Id.*

There are many references in the record to Alabama and Coushatta settlements within the claim area. *See* DX 76. Many of the references undoubtedly refer to the same settlements. Moreover, many of the references represent temporary settlements as these Indians journeyed westward to their permanent homes. In any event, the record shows that the Alabamas migrated from northwestern Louisiana and eventually settled along the Neches River. In 1805, Spanish reports indicate that there was an Alabama settlement at the intersection of the Attoyac Bayou and the Angelina River. Tr. 85–86; DX 10; PX 19. In 1806, some of these Alabamas moved westward and established settlements along the west side of the Neches River. DX 12. By 1809, there were 200 adult male Alabama Indians living along the Neches River. PX 53. In 1830, the Alabamas lived in three communities in northwest Tyler County— Peachtree Village, Flea Village and Fenced-in Village. Tr. 86–88; PX III (Martin 5)[16]; PX VII (Martin 1); PX 149 & 165.

The Coushattas migrated from southwestern Louisiana to the Trinity River. By 1806 Spanish reports show that there were Coushatta settlements ranging from the Spanish settlement at Villa de la Trinidad Salcedo, on the northern part of the Trinity River, to the coastal region on the southern end of the Trinity River. DX 10–12, 14 & 19. Until 1806, however, a large number of Coushattas remained in Louisiana. DX 10. There was a band of Coushattas near Atascosito until at least 1817. DX 23. In 1830, the Coushattas lived in three communities located in present-day San Jacinto and Polk counties along the Trinity River— Battise Village, Long King Village and Colita's Village. Tr. 93–95; PX III (Martin 7); PX VII (Martin 1); PX 149, 165 & 185.

By the end of the first decade of the nineteenth century, the Alabamas and Coushattas were making extensive use of the resources within the claim area. *Battise,* 12 Cl.Ct. at 429. They farmed, hunted and traded with the Spanish and Anglo–Americans. *Id.* The typical pattern was to farm for part of the year and then go on hunting expeditions in the fall and winter to obtain meat and animal pelts. *Id.* They traded animal pelts at posts located at Nacogdoches, in the northern part of the claim area, and at Natchitoches, across the Texas–Louisiana border in what is now Louisiana. *Id.*

The record has many references to Alabama and Coushatta Indians hunting within and beyond the borders of the claim area. The Alabamas were seen hunting on the Attoyac Bayou in 1802, PX 13, and on the Angelina River in 1805, PX 17. The Coushattas were seen hunting on the upper Brazos River, PX 84, and in Grimes County, PX 63. PX 172.

The record shows that while on hunting trips, the Alabamas and Coushattas tended to leave their villages unguarded. In 1833, Mary Houston Holley wrote of the Coushattas:

The Cushatees are most worthy of notice. They have their villages on the Trinity river, their houses are well constructed, and their fields well cultivated. They have good stocks of horses and cattle, use culinary utensils, and are hospitable to strangers. In autumn, when their crops are laid by, they range the country in small parties, to procure a winter's stock of venison and bear's meat, leaving their villages often without

multiple of the estimate of the number of men. *Battise,* 12 Cl.Ct. at 429.

**16.** The primary testimonial evidence at this trial consisted of written reports submitted by each of the three expert witnesses—namely, Jack Campisi and Howard Martin, testifying for the plaintiff, and Lawrence Kelly, testifying for the defendant. At trial, these witnesses were only permitted to summarize the material contained in their respective reports. Therefore, the parenthetical references used throughout this section of the opinion refer to the author of the report that is being cited.

a single individual to protect them. They are few in number and quite friendly. When among the settlements they conduct themselves with great propriety, and know the difference between a wild hog and one that has a mark on his ear. PX 80. According to one of the tribe's expert witnesses, "[t]his suggests that they were remote from hostile tribes, and that there was no competition for their land or its resources." PX I (Campisi 38). This passage also demonstrates the extent to which these Indians were domesticated.

Several contemporaneous accounts described the hunting technique used by the tribe. For instance, W.P. Zuber, writing around 1830, provided the following description of the Coushattas:

> Small parties of Kickapoo and Coshattee Indians frequently camped near us, to whom we bartered corn and sweet potatoes for moccasins, dressed deer skins, venison and slain wild turkies. I think the Indian manner of hunting deer is interesting. While on their hunting excursions, their custom was to encamp just two and a half days at a place, removing every third day. The women and children kept the camp while the men hunted for game. When removing from a camp, they set the grass on fire for a considerable distance to the right and the left of their route, thus killing the grass on the ground on which they had last hunted, and driving the remaining deer in the direction in which they traveled. Thus herding the deer with fire, they kept plenty of them conveniently near their camp.

PX 82. Jack Campisi, one of the tribe's expert witnesses points out that this technique required considerable amounts of land. PX I (Campisi 38–39).

The Alabamas and Coushattas built trails and used the rivers in order to travel throughout the claim area. *Battise*, 12 Cl. Ct. at 429. Relying primarily on county maps showing original land surveys within the county and surveyor's passing calls in the field notes for these surveys, Martin located and plotted these routes. *See* Tr. 109–12; PX III (Martin 10–11); PX VII (Martin 1–4). Martin's description of the trails shows that the Indians had access to large portions of the claim area.[17] Many of these trails connected the major settlements, including Peachtree Village, Colita's Village, Battise Village and Long King's Village. PX III (Martin 10–11); PX VII (Martin 1–4).

### B. *Other Indian Tribes*

Judge White found that there were three groups of Indians that were indigenous to Texas located in the claim area—the Hasinai Confederacy, the Bedais and the Orcoquizacs. *Battise*, 12 Cl.Ct. at 429–30.

The tribes of the Hasinai Confederacy, a branch of the Caddos, were located in the area immediately north of the San Antonio Road until the 1850's. *Id.* at 429–30; Tr. 375, 518, 521–22, 619. In 1809, the Hasinai population included 60 men with families. *Battise*, 12 Cl.Ct. at 429–30. Campisi, an expert witness for the tribe, testified that the Hasinai exercised an influence over what are now the Texas counties of Nacogdoches, Sabine and San Augustine. *Id.;* Tr. 653.

The Bedais lived in the area west of the Trinity River until about 1850. *Battise*, 12 Cl.Ct. at 430. In 1804, the Bedais population included 300 persons. *Id.;* DX 7. Campisi testified that the Bedais exercised an influence over what are now the Texas counties of Walker and Montgomery. *Battise*, 12 Cl.Ct. at 430; Tr. 649. The Bedais cultivated corn and traded furs and animal pelts. *Battise*, 12 Cl.Ct. at 430.

The Orcoquizacs lived in the area that was immediately south of the Atascosita Road until about 1850. *Id.* In 1804, the Orcoquizac population included 250 persons; in 1819, their population included 300 persons. *Id.;* DX 7 & 24. Campisi testified that the Orcoquizacs exercised an influence over what are now the Texas counties of Chambers and Jefferson, the southeast two-thirds of Orange County, and the lower third of Liberty County. *Battise*, 12 Cl.Ct. at 430; Tr. 657. The Orcoquizacs cultivated corn, hunted, fished and traded

---

17. In addition, several histories of Texas describe these trails. *See* PX 62, 63 and 64.

furs. *Battise*, 12 Cl.Ct. at 430. The Orco-quizacs were closely allied with and spoke a language similar to that of the Bedais. *Id.;* Tr. 375, 662.

Based on the lack of evidence in the record showing hostility between the Alabamas and Coushattas and the indigenous Texas tribes, Judge White concluded that "the indigenous Texas Indians and the Alabamas and Coushattas lived together in peaceful coexistence, and jointly used the resources of the claim area, until all of them were later adversely affected by the influx of non-Indians into the claim area." *Battise*, 12 Cl.Ct. at 430.

There were some members of three other Indian tribes, none of which was indigenous to Texas, that lived in the claim area for some portion of the period that is involved in the present litigation. *Id.* The immigrant tribes were the Biloxis, the Choctaws and the Pakana Muskogees. *Id.*

About 100 Biloxi Indians moved into the claim area in 1807, and settled on what is now known as Biloxi Creek, a tributary of the Neches River. *Id.* The Biloxi population later increased to approximately 300 members. *Id.* Sometime between 1830 and 1840, the Biloxis moved their settlement to the lower Sabine River, but, after 1840, they returned to their former village on Biloxi Creek. *Id.* While present in the area, the Biloxis intermarried with the Alabamas and the Coushattas. *Id.* There are no references in the record to Biloxi presence in the claim area after the 1840's. *Id.*

Some Choctaws were living in the claim area during the relevant period. *Id.* Spanish officials reported that the Choctaws raided Nacogdoches along with the Biloxis and Alabamas in 1804. DX 7. The Choctaws cultivated corn, hunted and had a considerable trade in furs. *Battise*, 12 Cl. Ct. at 430. In 1805, some Choctaws are known to have been living in the southern portion of the claim area on the west bank of the Trinity River near the coast. *Id.;* DX 10. In 1809, 40 Choctaw men, with their families, were living on the Neches River near its intersection with the Angeli-na River, in the same vicinity as the Alabamas. *Battise*, 12 Cl.Ct. at 430; PX 53. Then, in 1840, the Choctaws moved north, to the area between the Neches and the Angelina Rivers. *Battise*, 12 Cl.Ct. at 430. Campisi testified that the references to the Choctaws reflected scattered observations of these Indians as they passed through the claim area. Tr. 635.

About 75 to 100 Pakana Muskogees moved into the claim area in 1834 and settled along the Trinity River in what is now Polk County. *Battise*, 12 Cl.Ct. at 431; Tr. 102–03, 666. They had migrated westward from Alabama with the Alabamas and Coushattas shortly after 1763. *Battise*, 12 Cl.Ct. at 431; Tr. 102–03. The Pakana Muskogees spoke a language similar to that of the Alabamas and the Coushattas and were gradually absorbed by the Alabamas and Coushattas. *Battise*, 12 Cl. Ct. at 431.

Judge White found that the Biloxis, Choctaws and Pakana Muskogees lived in peaceful coexistence, sharing the resources of the claim area, with the Alabamas, Coushattas and the indigenous Texas tribes. *Id.*

## C. *Sovereignty Over Texas*

The histories of New Spain, Mexico and Texas play a large role in the history of the Alabamas and Coushattas in the 19th century. Hence, it is important to describe the respective sovereigns and the succession of revolutions that occurred in the area during this period.

Texas remained under Spanish control until 1821. *Id.* While under Spanish sovereignty, Texas was a province that had a government that was almost wholly military. DX 21. Largely due to the scarce population of Texas and in effort to prevent filibustering expeditions,[18] which were becoming common, New Spain did not permit Anglo–Americans to enter Texas. DX 21. Nonetheless, beginning in 1810, a series of revolts occurred in New Spain until finally, in 1821, Augustin de Iturbide succeeded in forcing Spain to recognize the

---

**18.** During the early nineteenth century, Anglo–American revolutionaries from Louisiana came to Texas to revolt against the Spanish government.

independence of Mexico. DX I (Kelly 19–20); DX 21. In 1822, Iturbide declared himself emperor. DX I (Kelly 24).

Judge White found that "when Spanish sovereignty over Texas ended, the Alabamas and Coushattas were living in the claim area in peaceful coexistence with other Indian tribes" and that, as of 1821, "there had been no movement of non-Indian settlers into the claim area."[19] *Battise*, 12 Cl.Ct. at 431. He further found that Spain "did not at any time grant to the Alabamas and Coushattas, or to other Indians tribes, rights of ownership, or recognize that the Indians enjoyed such rights, in lands within the claim area." *Id.*

In 1823, Iturbide was deposed by a coup led by Santa Anna, and in 1824, under Mexican rule, the former Spanish provinces became states. DX I (Kelly 24). Due to Texas' scarce population, it was joined with another former province, Coahuila, to form a state. *Id.* In 1824, Mexico enacted a statute that permitted the states to enact their own colonization laws, and in 1825 the State of Coahuila and Texas passed a colonization law to encourage white settlers to move to Texas. *Battise*, 12 Cl.Ct. at 431; DX I (Kelly 25). This law permitted each non-Indian immigrant to receive one square "league" of grazing land and a smaller amount of farming land. *Battise*, 12 Cl.Ct. at 431. Judge White found that many white settlers moved into Texas as a result of this law.[20] *Id.* He further found that the Mexican Government made land grants to the white settlers, but that it refused to issue such grants to the Alabamas and Coushattas, despite the Indians' repeated requests that it do so. *Id.*

In 1833, Mexico's president, Santa Anna, abolished the federal system, and, as a result, in 1836, Texas declared its independence from Mexico and formed an army with Sam Houston as the commander-in-chief. DX I (Kelly 33). Judge White found that by 1836 "much of the claim area, except for the Big Thicket, was occupied by white settlers." *Battise*, 12 Cl.Ct. at 431.

The Republic of Texas instituted a liberal land policy for citizens of the Republic, but it too excluded Indians. *Id.* The number of land grants issued by the Republic of Texas shows the extent to which settlers took advantage of this policy. *See* DX 84. Judge White found that the "continued movement of white settlers into the claim area disturbed the normal lifestyle of the Indian tribes" and that "by 1840, white settlers were claiming the Indians' village sites, and forcing the Indians to move elsewhere." *Battise*, 12 Cl.Ct. at 431.

In response to the adverse effect that white settlements were having on the Alabamas and Coushattas, the Republic of Texas determined in 1840 to grant two "leagues" of land to the Alabamas and two "leagues" of land to the Coushattas for permanent reservations. *Id.* The proposed Alabama land grant included within it the site of an established Alabama village. *Id.* When surveyors came to prepare a survey for the Alabama land grant, the Alabamas fled, assuming the grant was for white settlers. *Id.* Likewise, the Coushattas' land grant also did not become effective because white settlers had already claimed the designated lands. *Id.* at 431–32.

Texas entered the Union as a state on December 29, 1845. Judge White found that when United States' sovereignty attached, "the non-Indian population of the claim area was many times the number of Alabamas and Coushattas in the area," and that "the influx of non-Indian settlers had deprived the Alabamas and Coushattas of such control as they had formerly exercised over the area." *Id.* at 432. The 1850 federal census showed that the non-Indian population of the claim area was somewhat in excess of 30,000. *Id.* at 432 n. 3. At

---

**19.** A survey of Spanish land grants shows that, as of 1821, there were about seven land grants issued within the claim area—three in Angelina County, one in Jasper County and three in Trinity County, for a total of 19,254.30 acres. DX 84.

**20.** During the period from 1821 to 1830, when Mexico was an independent republic, there were about three land grants issued within the claim area—one in Montgomery County and two in Trinity County. DX 84. By 1830, about 26,-265.80 acres had been granted. DX 84.

that time, there were about 1,000 Alabamas and Coushattas in the claim area. *Id.*

Under the equal-footing doctrine, all states admitted to the Union have the same rights as the original thirteen states. Pursuant to this doctrine, Texas retained the ownership of all public lands located within its borders when it entered the Union. *See United States v. Texas,* 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950). In 1853, the Alabamas sought a land grant from Texas due to the severe displacement from their land that they had experienced. *Battise,* 12 Cl.Ct. at 432. In 1854, Texas gave the Alabamas a reservation of 1,110.7 acres, which constitutes part of the tribe's reservation at the present time. *Id.* Thereafter, the Coushattas also petitioned Texas for a land grant. *Id.* In 1856, the Texas Legislature passed a statute which provided that 640 acres should be set aside for the Coushattas; no specific area of land was ever designated pursuant to this statute, however, and the Coushattas were left wandering about without land. *Id.* In 1859, however, with the permission of the Alabamas, most of the Coushattas moved onto the Alabama reservation. *Id.* In 1928, the federal government purchased an additional 3,071 acres for the tribe, adjoining the original Alabama reservation. *Id.*

## IV

The referral of H.R. 1232 (98th Cong.) authorized this court to consider claims "based upon fair and honorable dealings that are not recognized by any existing rule of law or equity." Judge White explicitly found the tribe's claim to be within the scope of the referring legislation.[21] *Alabama Coushatta Tribe of Texas v. United States,* 9 Cl.Ct. 500, 501–02 (1986). Furthermore, he held that the following three issues would be controlling: (1) whether the government was under a duty of fair and honorable dealings with respect to the protection of the tribe's land, (2) if so,

whether the government discharged its duty and (3) if there was a duty and a breach of that duty, what the proper measure of damages would be. *Id.; see also Aleut Community of St. Paul Island v. United States,* 202 Ct.Cl. 182, 196, 480 F.2d 831, 838–39 (1973).

The Trade and Intercourse Act of 1834, ch. 161, 4 Stat. 730 (codified as amended at 25 U.S.C. § 177), deems any purchase, lease or other conveyance of tribal lands of no effect unless such conveyance is approved by Congress. The Act creates a duty on the federal government to protect all Indians holding land aboriginally within United States borders. *See United States v. Oneida Nation of New York,* 201 Ct.Cl. 546, 550–52, 477 F.2d 939 (1973); *Seneca Nation of Indians v. United States,* 173 Ct.Cl. 917, 925 (1965).

The question then is whether the tribe had aboriginal title to any portion of the claim area when United States sovereignty attached, so that subsequent dispositions of such property subjected the government to liability. Judge White concluded that the tribe did not have aboriginal title in December 1845, when sovereignty attached, because whether or not the tribe had aboriginal title to the these lands at some time prior to December 1845, such title was extinguished by 1845. Pursuant to the review panel's request for further factual findings, we address a more specific question: Notwithstanding the extinguishment of aboriginal title, did the tribe nonetheless establish aboriginal title to any portion of the claim area before December 1845?

In order to establish aboriginal title, the tribe must demonstrate actual, continuous and exclusive use and occupancy for a long time prior to the loss of the property. *Strong v. United States,* 207 Ct.Cl. 254, 260, 518 F.2d 556, 560 (1975), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975). "Occupancy necessary to establish aboriginal possession is a question of fact

---

**21.** In 1986, Judge White denied the government's motion to dismiss, holding that the tribe's claim was within the scope of the reference to the extent it was based on an alleged failure to protect the tribe in its possession of

any aboriginal lands. *Alabama Coushatta Tribe of Texas v. United States,* 9 Cl.Ct. 500, 501–02 (1986). Judge White held that the government had no duty to recover lands lost prior to 1845. *Id.*

to be determined as any other question of fact." *United States v. Santa Fe Pac. R.R.*, 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941).

■ The determination of whether an Indian tribe had actual and continuous possession of land is made with reference to the tribe's "habits and modes of life." *Mitchel v. United States*, 34 U.S. (9 Pet.) 711, 746, 9 L.Ed. 283 (1835). "[T]heir hunting grounds were as much in their actual possession as the cleared fields of the whites." *Id.; see also United States v. Seminole Indians*, 180 Ct.Cl. 375, 384 (1967) (because Seminoles were food-gatherers and hunters, their use "encompassed more than the soil actually 'possessed'"). This element may be proved by showing that a tribe had periodic contacts within some defined area. *See Seminole Indians*, 180 Ct.Cl. at 385; *Confederated Tribes of the Warm Springs Reservation of Oregon v. United States*, 177 Ct.Cl. 184, 194 (1966). Moreover, the fact that there may be few individual Indians on the claimed land does not necessarily defeat this requirement. "[T]he key to Indian title lies in evaluating the manner of land-use over a period of time. Physical control or dominion over the land is the dispositive criterion." *Seminole Indians*, 180 Ct.Cl. at 386.

■ The requirement that an Indian tribe's use and occupancy be "exclusive" generally precludes the establishment of aboriginal title if the region was "inhabited, controlled or wandered over by many tribes or groups." *United States v. Pueblo of San Ildefonso*, 206 Ct.Cl. 649, 669, 513 F.2d 1383, 1394 (1975); *see United States v. Santa Fe Pac. R.R.*, 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941). The rationale for this requirement is that before compensation is awarded to the Indians for the value of land they once occupied, it is important to determine that the Indians actually "owned" the land, and "one of the primary characteristics of ownership is the desire and ability to exclude others." *Strong v. United States*, 207 Ct. Cl. 254, 260, 518 F.2d 556, 561 (1975). Accordingly, land used as hunting grounds by several tribes cannot be claimed by any one of those tribes. *See Wichita Indian Tribe v. United States*, 696 F.2d 1378, 1385 (Fed. Cir.1983).

Nonetheless, the exclusivity requirement is not necessarily defeated by the presence of other Indians in an area. It is possible in some circumstances to establish aboriginal title despite the contemporaneous existence of other Indians in the region. In one case, the Court of Claims said that the "issue turns not upon whether the [Indians] were the exclusive occupants of the land but, rather, whether they availed themselves of their exclusive position." *Seminole Indians*, 180 Ct.Cl. at 383.

■ First, if it can be shown that two or more tribes had "joint and amicable" possession of a region, then the exclusivity requirement is satisfied. *See Strong*, 207 Ct.Cl. at 262, 518 F.2d at 561; *Turtle Mountain Band of Chippewa Indians v. United States*, 203 Ct.Cl. 426, 442, 490 F.2d 935, 944 (1974); *Pueblo of San Ildefonso*, 206 Ct.Cl. at 669, 513 F.2d at 1394. Political unity of the tribes is not required. *See Confederated Tribes of the Warm Springs Reservation of Oregon v. United States*, 177 Ct.Cl. 184, 206–07 (1966). It is necessary, however, that the tribes have a close social alliance. *See Strong*, 207 Ct.Cl. at 262–63, 518 F.2d at 561.

■ Second, the requirement may be met by showing that the tribe claiming to have aboriginal title to the region was dominant. For example, in *Seminole Indians*, 180 Ct.Cl. at 383, the fact that there were scattered groupings of other Indians in Florida did not defeat aboriginal title where there was no evidence that Seminole dominion was challenged and there was evidence of a pattern of cultural assimilation.

■ Finally, if one tribe had aboriginal title to a particular region but gave permission to other Indians to use the land, then this permissive use did not defeat the exclusivity requirement. Likewise, the presence of other Indians in a region as "guests" of a possessing tribe is not sufficient to defeat the aboriginal title of the tribe. *Wichita*, 696 F.2d at 1385 (holding that the Wichita Indians retained aboriginal

title to lands in southern Oklahoma despite the entry of the Comanches and Kiowas for purposes of trading with the Wichitas).

The term "aboriginal title" connotes rights deriving from ancestral use. *See United States v. Santa Fe Pac. R.R.*, 314 U.S. 339, 345, 62 S.Ct. 248, 251, 86 L.Ed. 260 (1941). The ICC and Court of Claims retreated from this view, however, in deciding cases under the ICCA. According to the Court of Claims, "[t]he status of aboriginal ownership is not accorded to tribes at the very instant they first dominate a particular territory but only after exclusive use and occupancy 'for a long time.' " *Sac and Fox Tribe v. United States*, 161 Ct.Cl. 189, 205, 315 F.2d 896, 905, *cert. denied*, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963). The "for a long time" requirement is a question of fact and cannot be fixed at a specific number of years. *See Confederated Tribes of the Warm Springs Reservation of Oregon v. United States*, 177 Ct.Cl. 184, 194 (1966). *But see United States v. Seminole Indians*, 180 Ct.Cl. 375, 387 (1967) (holding that fifty years is sufficient to satisfy the requirement as a matter of law). The time period "must be long enough to have allowed the Indians to transform the area into domestic territory so as not to make the Claims Commission Act 'an engine for creating aboriginal title in a tribe which itself played the role of conqueror but a few years before.' " *Confederated Tribes of the Warm Springs Reservation of Oregon*, 177 Ct.Cl. at 194 (quoting *Sac and Fox Tribe*, 161 Ct.Cl. at 206, 315 F.2d at 905).

## V

■ As stated above, in determining whether a tribe has aboriginal title to an area, courts decide whether the tribe has physical dominion or control over a definable territory. Case law makes clear that this does not require proof that the tribe was the sole occupant of every square yard of the claim area. Instead, the test is whether the portion of the land claimed, keeping in mind the particular tribe's lifestyle, may fairly be considered the tribe's "home." This inquiry is necessarily imprecise and in large part turns on an assessment of whether the tribe itself and others in contact with the tribe considered the area to be under the tribe's dominion.

This part of the opinion addresses whether the tribe has proved that it had aboriginal title to the modified claim area at any time before 1845. The government maintains that the tribe has not met its burden of proof. The government's assertions fall into two general categories: (1) that the tribe did not actually and continuously use and occupy this area and (2) that the tribe did not exclusively use and occupy this area.

## A

First, we address the issue of whether the tribe actually and continuously used and occupied the modified claim area. The government contends that the tribe has not shown use of Newton, Jasper, Orange, Montgomery, Walker or Trinity County. In addition, the government contends that the tribe has not shown that its hunting expeditions extended beyond the area immediately surrounding its settlements. For both of these propositions, the government relies on PX IV, which is a map prepared by one of the tribe's experts that depicts the locations of the various bands of Indians discussed at trial. PX IV shows no Alabama or Coushatta settlement in any of the counties listed by the government and shows only two hunting camps, both located in Polk County. Finally, the government asserts that the settlements that are shown on the map do not reflect settlements lived in by the Indians simultaneously throughout the relevant period. Instead, according to the government, many of the alleged settlements indicated on the map represent temporary villages.

Starting with the premise that each of Judge White's findings should be adopted, we turn to findings already made that are relevant to this issue. Judge White found that by the end of the first decade of the nineteenth century, the Alabamas and Coushattas "had created extensive settlements in the claim area, along the lower Sabine River, along the Trinity River (as

far north on the Trinity as Salcedo and as far south as Atascosito), near the San Jacinto River, on the Neches River, between the Neches and Trinity Rivers, on the Attoyac Bayou, and along the Opelousas Road." *Battise,* 12 Cl.Ct. at 429. He found that by 1810, the total number of Alabamas and Coushattas was a multiple of 350. *Id.*

He found that they were making an extensive use of the resources within the claim area. *Id.* He found that they hunted throughout the claim area, that they traded at Nacogdoches and Natchitoches, that they built trails in order to travel through the claim area and that they used the rivers as a means of travel. *Id.*

Our review of the evidence confirms these findings. There is no doubt that the tribe had a significant presence in eastern Texas in the early 1800s, that the tribe occupied different portions of the land throughout east Texas at various times, that the tribe, by way of trails and rivers, was able to travel far distances and that the tribe eventually established permanent settlements in the area and was highly domesticated.

We also conclude that the tribe hunted throughout and beyond the modified claim area. A fair interpretation of the record does not support the government's argument that the tribe only hunted in the area immediately surrounding their permanent village sites. We know that the tribe traveled great distances in the area and that its method of hunting required the use of large portions of land. Further, the tribe traded with the Spanish at Nacogdoches and Natchitoches, both of which are outside the modified claim area. Finally, Indians from the tribe were seen hunting in Grimes County, which is west of the claim area. Based on each of these facts, we think it is reasonable to infer that the tribe hunted extensively throughout the modified claim area.

It is true, as the government argues, that the tribe did not live in all parts of the modified claim area from 1800 to 1845.

Instead, the references in the record to settlements in each of these places represent the temporary homes of these Indians as they journeyed westward to their permanent settlements. This does not seem to be a point that seriously can be disputed. The tribe's expert asserts that "[i]n 1830, the Alabamas lived in three communities in northwestern Tyler County," PX III (Martin 5) and that "[i]n 1830, the Coushattas reached the zenith of their existence in independent villages. About 600 lived in or near three Coushatta communities," PX III (Martin 7). In other words, the tribe's witness agrees that the Alabamas and Coushattas migrated from Louisiana, and, over a period of years, eventually reached the areas where they permanently settled.

The tribe contends that under the Court of Claims decision in *Seminole Indians,* it does not need to show that its permanent settlements ranged throughout the modified claim area. The *Seminole Indians* court upheld a finding of the Indian Claims Commission that a 2500–member tribe had aboriginal title to the entire Florida peninsula even though the record showed that the tribe's permanent settlements were all located in the northern part of the peninsula and the tribe only used the southern portion of the peninsula for hunting.

Based on the Court of Claims' application of the actual and continuous use and occupancy requirement in *Seminole Indians,* we conclude that the tribe satisfied this requirement with respect to the modified claim area even though the tribe did not maintain villages in every portion of this area throughout the entire relevant period.[22]

## B

The second major issue is whether the tribe's use and occupancy of the modified claim area was exclusive. The government maintains that the use and occupancy of the region by other Indian tribes, Spanish settlers and military troops and Anglo–

---

**22.** Nonetheless, the absence from the record of any evidence showing that the Indians used the counties listed by the government goes to the weight of the tribe's claim to dominate those areas.

Americans defeated the exclusivity of the tribe's use and occupancy.

### 1

The government contends that five different tribes, namely the Bedais, Orcoquizac, Hasinai Confederacy, Biloxi and Choctaw, used the modified claim area in a way that defeated the exclusiveness of the use by the Alabamas and Coushattas.

Three of these tribes—the Bedais, Orcoquizac and Hasinai Confederacy—were indigenous to east Texas. Judge White found that when the Alabamas and Coushattas entered the claim area, these indigenous tribes were "utilizing the resources of at least substantial portions of the claim area for their farming and hunting activities." *Battise*, 12 Cl.Ct. at 433. The record shows that the Indians from each of these tribes were both hunters and agriculturists. This means they each had an influence over large portions of land in eastern Texas.

Judge White defined the areas of influence of each of these tribes.[23] The Bedais lived in the western portion of the claim area until about 1850 and had an influence over Walker and Montgomery Counties. *Id.* at 430. The Orcoquizacs lived in the southern portion of the claim area and exercised an influence over Chambers, Jefferson, two-thirds of Orange and one-third of Liberty Counties. *Id.* The Indians of the Hasinai Confederacy lived in the northern portion of the claim area and exercised an influence over Nacogdoches, Sabine and San Augustine Counties. *Id.* at 429–30.

The two remaining tribes—the Choctaw and Biloxi—were immigrants. Judge White found that these tribes moved into the claim area while the Alabamas and Coushattas were moving in and that they "thereafter lived in the same general vicinity of the Alabamas and Coushattas." [24] *Id.* at 433.

About 100 Biloxis moved into the claim area in 1807, and settled on Biloxi Creek, a tributary of the Neches River. The Biloxis remained in this area until at least 1830. While present in the claim area, the Biloxis intermarried with the Alabamas and Coushattas.

References to Choctaw presence in eastern Texas are limited. In 1805, a band of Choctaws lived on the Trinity River, near Atascosito. In 1809, 40 Choctaw men, with families, lived near the junction of the Angelina and Neches Rivers. In 1819, the Choctaws lived on the lower Sabine River. Finally, in 1840, the Spanish reported that the Choctaws had returned to the area between the Neches and Angelina Rivers.

The tribe contends that none of these tribes interfered with its exclusive use of the modified claim area. The tribe asserts that the Bedais, Biloxis and Choctaws, although present within the modified claim area, did not use the area in a way that defeated the tribe's exclusive use under the test for establishing aboriginal title. Further, the tribe contends that the Orcoquizacs and the Hasinai Confederacy occupied regions in the original claim area that have been excluded from the modified claim area.

First, we address whether the uses of the modified claim area by the Bedais, Biloxis and Choctaws fall into any exceptions to the exclusivity requirement. The plaintiff tribe argues that the Alabamas and Coushattas were dominant over the Bedais. The plaintiff tribe relies on the small number in that tribe and asserts that the Bedais intermarried with the Coushattas and were under their control.[25] The record

---

23. In defining spheres of influence, Judge White referred to and relied upon the testimony of the tribe's expert witness, Jack Campisi, in whom he apparently had confidence.

24. Judge White also noted the presence of a third immigrant tribe—the Pakana Muskogee. The parties agree that this tribe moved to the claim area around 1834 and was absorbed by the Alabamas and Coushattas. Accordingly, the presence of this tribe did not interfere with the Alabama-Coushatta Tribe's dominion in the modified claim area.

25. For its assertion that the Bedais intermarried with the Coushattas and were under their control, the tribe relies exclusively on a statement purportedly contained in an 1807 report by John Sibley. Actually the statement appears in a footnote to the introduction of a collection of reports of John Sibley published in 1922. *See* PX 84. The statement was attributed to a news-

shows that the Bedais were an indigenous tribe that declined in size following an epidemic in 1776–1777. In 1804 there were approximately 300 persons in the tribe. In 1850, there remained a small Bedais village in the western portion of the modified claim area. The Bedais tribe is now completely extinct.

In discussing the relationship between the indigenous tribes (including the Bedais Indians) and the Alabamas and Coushattas, Judge White said:

> There is no evidence in the record regarding any hostile actions taken by the Alabamas and Coushattas toward the indigenous Texas Indians, either designed to drive the Texas Indians out of the claim area or to prevent them from utilizing the resources of the claim area. Conversely, there is no evidence in the record regarding any hostile actions taken by the indigenous Texas Indians designed to prevent the Alabamas and Coushattas from settling in the claim area or from using the resources of the area. Similarly, there is no evidence in the record indicating that the Alabamas and Coushattas sought or obtained permission from the indigenous Texas tribes to settle in the claim area, or that the Texas tribes sought or obtained permission from the Alabamas and Coushattas to remain in the area and use its resources. It is inferred, therefore, that the indigenous Texas Indians and the Alabamas and Coushattas lived together in peaceful coexistence, and jointly used the resources of the claim area, until all of them were later adversely affected by the influx of non-Indians into the claim area.

*Battise*, 12 Cl.Ct. at 430.

We conclude that the Alabamas and Coushattas were not dominant over the

Bedais. The record shows that the Bedais retained an independent presence in Walker and Montgomery Counties until at least 1850. Judge White found no evidence of hostility or permissive use. The tribe has not proved that the Bedais were anything other than an independent, yet friendly, tribe that lived nearby and shared hunting grounds with the other tribes in the area.

The tribe agrees that the Biloxis settled in the heart of the modified claim area, but the tribe contends that Alabamas and Coushattas were dominant over the Biloxis or that the Alabama–Coushatta Tribe and the Biloxi Tribe had joint and amicable possession of the area. The tribe relies primarily on the finding by Judge White that the Biloxis and Coushattas intermarried—a finding that we do not disturb.

The government argues that even though the Biloxis and Coushattas may have intermarried, there is no further evidence of assimilation. The government points out that the Biloxis maintained a separate existence until at least 1830.

Indeed, the fact that the Biloxis and Coushattas may have intermarried shows that they related to each other socially, but it does not necessarily show that one tribe was dominant over the other.[26] Furthermore, in his discussion of the relationship between the Alabamas and Coushattas and the immigrant tribes, Judge White stated:

> It appears from the record that the Biloxis, the Choctaws and the Pakana Muskogees lived peacefully, and used resources of the claim area, along with the Alabamas and Coushattas and the indigenous Texas tribes. There is no evidence in the record indicating that the Biloxis, the Choctaws, or the Pakana Muskogees

paper article from the Cincinnati Gazette published sometime after 1820. We conclude that PX 84 lacks credibility because it is the only source for this assertion, it is not a primary source (an article written contemporaneously with the events at issue) and it offers no support for its conclusion.

**26.** Although in *United States v. Seminole Indians*, 180 Ct.Cl. 375, 383 (1967), the Court of Claims held that evidence in the record showing a "pattern of cultural assimilation" between the

Seminoles and remnant indigenous tribes supported a finding of Seminole dominance, we conclude that our case is substantially different. The Biloxis were not simply a remnant indigenous tribe but instead were a new tribe in the area that migrated to the claim area independently of the Alabamas and Coushattas. Moreover, the fact that the tribes intermarried does not establish that the Biloxis were assimilated into the Alabama–Coushatta Tribe.

sought or obtained permission from the Alabamas and Coushattas to move into and use resources of the claim area. *Battise*, 12 Cl.Ct. at 431.

Again we conclude that the tribe has simply failed to prove that it was dominant over the Biloxis. Judge White found no evidence of permissive use or hostility, and the sole ground relied upon by the tribe—intermarriage—does not by itself show that one tribe was dominant over the other. Moreover, the tribe has failed to prove that it meets the standard for "joint and amicable" possession with respect to the Biloxis. To meet this standard, the relationship between the tribes need not be a political alliance but must be "extremely close." *Strong v. United States*, 207 Ct.Cl. 254, 262, 518 F.2d 556, 561 (1975). The tribe has not shown that the Biloxis, Alabamas and Coushattas considered themselves to be, or acted in a way to suggest to others, that they were a closely integrated entity. The fact that tribes may have used the same lands, and acted as separate tribes that were allies and friends is not sufficient to establish "joint and amicable" possession. *See Strong*, 207 Ct.Cl. at 263, 518 F.2d at 562.

Finally, the plaintiff tribe contends that Choctaw use was not inconsistent with Alabama and Coushatta dominion in the modified claim area because it was permissive and sporadic. Judge White's findings reveal that Choctaw presence was widely scattered and that the tribe never permanently settled at any location within the modified claim area. Relying on *Spokane Tribe of Indians v. United States*, 163 Ct.Cl. 58, 64 n. 5 (1963), the tribe argues that the "scattered observations" of Choctaws cannot be given weight. In *Spokane*, the Court of Claims discounted evidence that neighboring tribes "seasonally used land in the direction of the disputed area to get food," *id.* at 68, on the ground that the

government did not show the limits of the use. Nonetheless, as stated above, Judge White found that the Choctaws and the plaintiff tribe shared the resources of the claim area and found no evidence suggesting that the Choctaws lived in the area with the permission of the Alabamas and Coushattas. The government is not required to prove that other Indians established permanent settlements in or had aboriginal title to an area in order to show that the tribe's use of the area was not exclusive.[27]

Before turning to the effect of the mixed use of the region by the Alabamas, Coushattas, Choctaws, Biloxi and Bedais, we consider the tribe's argument that the evidence relating to the Orcoquizacs and the Hasinai Confederacy is irrelevant given the new boundaries of the claim area. The government disagrees and points out that although these Indians may have settled in the excised portions of the original claim area, they did venture into the modified claim area on some occasions for purposes of hunting and trading. As we discussed above, the government is not required to show that the Orcoquizacs and Hasinai had aboriginal title or permanently settled in an area for their use of that area to defeat the tribe's exclusive use. Judge White found that the indigenous tribes used substantial portions of the claim area for farming and hunting. Further, the record shows that these tribes did in fact hunt in portions of the claim area. Accordingly, we conclude that these tribes shared portions of the claim area with the Alabamas and Coushattas.

Mixed use of an area precludes the establishment of aboriginal title by any of the users of the property. Portions of the modified claim area were in fact inhabited by other tribes, and we have concluded that the Alabamas–Coushatta tribe was not dominant over those tribes. In *Wichita*

---

**27.** It is true that the *Spokane* court seems to place the burden of proof on the government to establish the lack of permissive use. The statements relied on by plaintiff, however, must be read in their proper context. In *Spokane*, it was entirely reasonable to assume that any use of the area by neighboring tribes was permissive because there was no contemporaneous evidence placing these tribes in the disputed area and because the other evidence in the record was not consistent with the evidence at issue. In our case, contemporaneous evidence shows that the Choctaws actually lived in the area at issue.

*Indian Tribe v. United States*, 696 F.2d 1378 (Fed.Cir.1983), the Federal Circuit addressed the issue of exclusive use in the context of a case in which the Wichitas claimed lands in Kansas, Oklahoma and Texas, and where portions of this land were clearly used by other tribes.

First, the Federal Circuit rejected the all-or-nothing approach taken by the trial court. Instead, the court found that the trial court should consider whether the Wichitas exclusively used any sub-areas within the claim area. *Wichita Indian Tribe v. United States*, 696 F.2d 1378, 1385 (Fed.Cir.1983).

Second, the court held that the hunting grounds immediately surrounding the Wichita villages should be deemed to be Wichita territory. The court's reasoning is instructive:

> If the Comanches and Kiowas entered Wichita territory mainly to trade with them and considered this land to be that of the Wichitas, these visiting tribes should be considered guests of the Wichitas, and their presence would not affect the Wichitas' aboriginal title.... While the Comanches and Kiowas may have ranged over large portions of the hunting grounds without any regard for the Wichitas, the closer the former two tribes came to the Wichitas' villages, the more likely it would be that they were entering what they viewed as Wichita land. At some near enough line, the Comanche and Kiowa presence would not have impinged on the Wichitas' exclusive use of the land.

*Wichita*, 696 F.2d at 1385. The Federal Circuit remanded to the trial judge to determine the boundaries of the aboriginal title lands. In doing so, the court noted that the boundaries probably could not be determined with precision and directed the court to use the "jury verdict method." *Id.* at 1386.

The *Wichita* analysis is determinative in this case. It is clear that the Alabamas and Coushattas were not the sole possessors of the lands in east Texas. We have concluded that the Alabamas and Coushattas were not dominant over the other Indi-

ans in the area. Accordingly, the remaining question is whether the tribe meets the requirements for aboriginal title with respect to some portion of the modified claim area.

Under *Wichita*, the tribe is entitled to a finding of liability on that portion of the lands claimed to which it can meet the requirements for showing aboriginal title even if the record does not permit a finding as to the exact boundaries of the aboriginal title lands. There is no evidence in the record that would support a finding of the precise boundaries of the aboriginal title lands. We doubt that such information can be found. Much of the evidence relied on by this court consists of inferences made by the witnesses from a small amount of contemporaneous evidence. Nonetheless, although the boundaries of the lands exclusively and actually used cannot be accurately determined, this failure of proof does not defeat the tribe's claim.

Accordingly, we conclude that the tribe did not exclusively use the large portion of the modified claim area because of the presence of other Indian tribes. We further conclude that the tribe did exclusively use its village sites and the immediately surrounding hunting grounds based on the analysis set forth in *Wichita*. Having limited the boundaries of the claim area, we address the effect, if any, of the Spanish and Anglo–American settlers who were in the same general area.

**2**

In addition to the various Indian tribes, Spanish settlers and soldiers used parts of the original claim area. When the Alabamas and Coushattas began their movement into Texas, there were no non-Indian settlements in the area, with the exception of a Spanish military garrison and trading post in Nacogdoches County. In 1803, there were only 300 Spanish military men in the entire territory that is now Texas. In 1805, the Spanish established a military post at Atascosito and moved a group of settlers into the new town of Trinidad de Salcedo. The number of soldiers at Atascosito is not in the record, but there were 90 settlers at Salcedo.

The specific areas in which the Spanish were located were part of the original claim area but are not part of the modified claim area. Undoubtedly, the Spanish traveled throughout eastern Texas as evidenced by the diaries and letters found in the record. Nonetheless, unlike the Indians, the record does not suggest that the Spanish way of life included using large portions of land within the modified claim area. In any event, there is no evidence suggesting that the Spanish interfered with the tribe's exclusive use of its village sites and nearby hunting grounds.[28]

3

Finally, the government asserts that the migration of white settlers precludes a finding that the tribe had aboriginal title to any portion of the modified claim area.

Judge White found that, as of 1821, there had been no movement of non-Indian settlers into the claim area; that, in 1825, as a result of a liberal colonization law, many white settlers moved into the claim area; that, by 1836, much of the claim area, except for the Big Thicket, was occupied by white settlers; that the continued movement of white settlers into the claim area disturbed the normal lifestyle of the Indian tribes; and that, by 1840, white settlers were claiming the Indians' village sites, and forcing the Indians to move elsewhere.

DX 84, which contains excerpts from volumes entitled *Abstracts of All Original Texas Land Titles Comprising Grants and Locations to August 31, 1941*, supports the findings of Judge White. As of 1821, the Spanish had issued approximately seven land grants within the claim area—three in Angelina County, one in Jasper County and three in Trinity County. From 1821 to 1830, Mexico issued an additional three land grants within the claim area—one in Montgomery County and two in Trinity County. In other words, prior to 1831 no grants had been issued in counties where the tribe had village sites, that is Polk, Tyler and San Jacinto Counties. Be-

tween 1831 and 1836, however, white settlement increased substantially. A rough count shows that approximately 170 grants were issued in the counties of Polk, San Jacinto and Tyler, for a total of approximately 740,000 acres.

Judge White's findings undeniably lead to several conclusions. First, if the tribe had not established aboriginal title by 1840, then white settlement precludes a finding that the tribe ever established aboriginal title to any portion of the modified claim area. Second, if the tribe had not established aboriginal title by 1836, then white settlement probably precludes a finding of aboriginal title to any part of the claim area, with the exception of the Big Thicket. Third, if the tribe had not established aboriginal title by 1825, then white settlement might preclude a finding of aboriginal title to some portions of the modified claim area. Finally, there was no white settlement prior to 1821 that could have prevented the tribe from establishing aboriginal title. Accordingly, the critical issue is the time by which, if ever, the tribe established aboriginal title to village sites.

The government does not dispute that for a short time, the Alabamas and Coushattas were undisturbed by white settlers in the use of the area around the Neches and Trinity Rivers. We conclude that white settlers began to interfere with the tribe's use of this area some time after 1830.

▆ Hence, the real issue with respect to the impact of white settlers is whether the tribe's presence in east Texas from 1800 to 1830 satisfied the "for a long time" requirement so that the arrival of white settlers is irrelevant. We conclude that it does. In the seminal case on aboriginal title, *Johnson v. McIntosh*, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823), the Court discussed aboriginal title in terms of having held the land from "time immemorial." Under this standard, the plaintiff tribe's claim would fail entirely. The standard was relaxed considerably, however, by the

---

**28.** Spain's assumption of sovereignty over these lands does not bar the tribe from establishing aboriginal title to these same lands. *See Turtle*

*Mountain Band of Chippewa Indians v. United States*, 203 Ct.Cl. 426, 438, 490 F.2d 935, 941 (1974).

ICC and Court of Claims in cases under the ICCA. According to the Court of Claims, a claimant tribe need only demonstrate that it exclusively used and occupied an area "for a long time" to establish aboriginal title. *Sac and Fox Tribe v. United States,* 161 Ct.Cl. 189, 205, 315 F.2d 896, 905, *cert. denied,* 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963). Whether the tribe has used an area "for a long time" is a question of fact, and the proper inquiry is whether the time period was long enough to allow the Indians "to transform the area into domestic territory." *Confederated Tribes of the Warm Springs Reservation of Oregon v. United States,* 177 Ct.Cl. 184, 194 (1966). The Alabamas and Coushattas were civilized tribes that spent at least half of each year engaged in farming. The record shows that they lived in villages and had well-constructed houses. Further, they developed a network of trails between the major village sites. At least by 1830, the tribe had domesticated the lands around their permanent village sites in Polk, San Jacinto and Tyler Counties. Accordingly, the tribe satisfied the "for a long time" requirement by using the lands around their permanent village sites from some time after 1800 to 1830.[29]

Accordingly, we conclude that as of 1830 the tribe had established aboriginal title to their village sites on the Neches and Trinity Rivers and to the immediate vicinities. The Alabamas exclusively used and occupied for a sufficient length of time to meet the standard for establishing aboriginal title the village sites known as Peachtree Village, Flea Village and Fenced–In Village. Likewise, the Coushattas exclusively used and occupied for a sufficient length of time to establish aboriginal title the village

sites known as Battise Village, Long King Village and Colita's Village.

We have no occasion to address the precise boundaries or the amount of damages owed to the plaintiff tribe because the review panel has not disturbed Judge White's original finding that the tribe did not have title in December 1845, when United States sovereignty attached, because aboriginal title, if established, was extinguished by the migration of white settlers into the claim area.

## VI

By H.R.Res. 69, 98th Cong., 1st Sess. (1983), the House of Representatives referred H.R. 1232,[30] 98th Cong., 1st Sess. (1983), to the chief judge of the United States Court of Federal Claims for proceedings in accordance with the provisions of sections 1492 and 2509 of title 28, United States Code.

Section 2509(c) provides:

The hearing officer to whom a congressional reference case is assigned by the chief judge shall proceed in accordance with the applicable rules to determine the facts, *including facts relating to delay or laches, facts bearing upon the question of whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy.* He shall append to his findings of fact conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitable due from the United States to the claimant.

---

**29.** As to whether this time period which does not exceed 30 years is "a long time," we note that in many states that have adopted English common law, periods of far less than 30 years of open, notorious and uninterrupted occupancy are sufficient to establish title by adverse possession. *See, e.g.,* Alaska Stat. § 09.10.030 (10 years); Ariz.Rev.Stat.Ann. § 12–526(A) (10 years); Nev.Rev.Stat. § 11.150, 40.090 (5 and 15 years, respectively); 42 Pa.Cons.Stat. § 5530(a)(1) (21 years); Tex.Civ.Prac. & Rem. Code Ann. §§ 16.024–16.026, 16.028 (3, 5, 10 and 25 years, respectively).

**30.** H.R. 1232, 98th Cong., 1st Sess. (1983), if enacted, would authorize the Secretary of the Treasury to pay a sum to be determined based upon an advisory opinion rendered by this court in settlement of all claims of the Alabama–Coushatta Tribe of Texas under the ICCA pertaining to the lands in east Texas, notwithstanding the failure to comply with the five-year statute of limitations under the ICCA.

(Emphasis added). This part of the opinion addresses issues related to the passage of time or other failures to pursue available remedies. First, we address whether the defense of laches should bar the tribe's claim. Second, we address whether the statute of limitations, which clearly acts as a bar to any legal claim, should be removed as a matter of equity. Third, we address whether there are facts that excuse the tribe for failing to resort to an established legal remedy. Judge White did not make findings on these three issues.[31] Accordingly, we consider these issues in the first instance.

■ Before discussing these issues, however, it is necessary to briefly discuss the meanings of the terms "legal claim" and "equitable claim." Of course, if a claim satisfies neither definition, then it is a "gratuity." The meaning of the term "legal claim" is straightforward; a plaintiff has a "legal claim" if plaintiff has a claim that is redressable in a court of law. To prevail in a court of law, a plaintiff must receive a favorable determination on the merits and must be able to overcome any technical bars such as the statute of limitations, laches, or other similar bars. The term "equitable claim," however, has been the source of considerable debate. See Jeffrey M. Glosser, Congressional References Cases in the United States Court of Claims: A Historical and Current Perspective, 25 Am.U.L.Rev. 595, 617–26 (1976) (discussing the differing interpretations of an "equitable claim"). The word "equitable" in a congressional reference case was interpreted originally as meaning a broad moral responsibility on the Government's part. Burkhardt v. United States, 113 Ct.Cl. 658, 667, 84 F.Supp. 553 (1949). Another line of cases has developed holding that the government must commit some wrongful act or omission in order to incur liability for an equitable claim. Shane v. United States, 3 Cl.Ct. 294, 304 (1983). Despite such confusion, the tribe has alleged facts that, if determined to be true, would entitle the tribe to recover under either equitable claim theory. The tribe has a claim that would be redressable at law (i.e., under the ICCA) except for the existence of a technical bar—the statute of limitations. The tribe maintains that the government unlawfully failed to apprise the tribe of its remedy under the ICCA. This type of claim clearly falls within the contours of an "equitable claim" if we decide that the tribe should in fact be excused for its untimeliness. See California Canners & Growers Ass'n v. United States, 7 Cl.Ct. 69, 98 (1984).

## A

■ The first question is whether the defense of laches bars the tribe's claim. In legal actions, a court will deny relief on the merits to a plaintiff who unreasonably delays in initiating his action if the delay causes prejudice to the government. Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc., 988 F.2d 1157, 1161 (Fed.Cir.1993). "The mere passage of time does not constitute laches." Id. Laches operates independently of the statute of limitations for the claim involved. In this court, laches is an affirmative defense that can be waived by the government. To establish this defense, the government must show that there was an unreasonable delay and that the delay caused prejudice. Id.

The government has not attempted to establish the defense of laches. If this were a legal action, the court would consider the defense waived. Nonetheless, because congressional reference proceedings are equitable and because section 2509 requires the court to make factual findings pertaining to laches, we briefly address the

---

**31.** Although Judge White did not address these three issues, he did find that the tribe's claim for relief, if granted, would be a "gratuity." He based this finding on the fact that the tribe did not prove that it had aboriginal title to lands within Texas borders when Texas became a state. He concluded that because the tribe had already lost possession of these lands by 1845, it was not the United States but Mexico and the Republic of Texas that were responsible for the loss. Accordingly, he found that any payment

issue.[32]

According to the tribe, it first learned of its right to file a claim under the ICCA in 1969. At that time, the tribe sought to intervene in the Caddo Tribe's claim pending before the ICC. Although the ICC initially granted permission to intervene, *Caddo Tribe of Oklahoma v. United States*, 17 Ind.Cl.Comm. 8 (1972), in 1975, the ICC dismissed the Alabama–Coushatta tribe's claim as untimely. *Caddo Tribe of Oklahoma v. United States*, 35 Ind.Cl. Comm. 321, 328 (1975). Then, the tribe sought legislation to address its claim in Congress. On September 21, 1977, H.R. 9234 was introduced; on March 8, 1979, H.R. 2711 and H.R.Res. 175 were introduced; on March 4, 1981, H.R. 2337 and H.R.Res. 114 were introduced; and on February 2, 1983, H.R. 1232 and H.R.Res. 69, which are the subject of this reference were introduced. Accepting as true the assertion that the tribe first learned of its ICCA claim in 1969, *see infra* part VIB (discussing the notice requirement), we conclude that the tribe has consistently pursued its claim since finding out about the ICCA. Accordingly, the delay in bringing this claim is not unreasonable.

**B**

■ The second question is whether the five-year statute of limitations for claims brought under the ICCA should be removed. The tribe contends that its failure to comply with the statute of limitations should be excused because it did not receive notice of the Act as specifically required by the Act.

As a general principle of American jurisprudence, everyone is presumed to know the law. Nonetheless, Congress plainly intended to rebut that presumption with respect to Indians with claims under the Indian Claims Commission Act. Section 13(a) of the Indian Claims Commission Act, ch.

959, 60 Stat. 1049, 1052 (1946) (codified as amended at 25 U.S.C. § 70*l* (1976)),[33] provides:

> As soon as practicable the Commission shall send a *written explanation* of the provisions of this Act to the *recognized head of each Indian tribe and band*, and to any other identifiable groups of American Indians existing as distinct entities, residing within the territorial limits of the United States and Alaska, and to the *superintendents of all Indian Agencies*, who shall promulgate the same, and shall request that a detailed statement of all claims be sent to the Commission, together with the names of the aged or invalid Indians from whom depositions should be taken immediately and a summary of their proposed testimonies.

(Emphasis added). This detailed notice procedure would have no practical impact if it did not excuse the tribe for failing to comply with the statute of limitations where the tribe did not receive the notice required and had no actual knowledge of the Act. This is especially true in a congressional reference case.

The facts pertaining to the issue of notice are as follows. The tribe introduced portions of the deposition testimony of three individuals—Charles Jones, Fulton Battise and Matthew Bullock.

Jones was the superintendent of the Alabama–Coushatta reservation during the years 1946 to 1951. He testified that he had no knowledge of anyone from the government coming to the reservation during that time and advising the tribe that they could file a claim against the government under the ICCA. Tr. 281. Further, Jones does not recall being informed in person or in writing of the ICCA. Tr. 282.

Battise is currently chief of the tribe and was the assistant chief during the years 1946–1951. He testified that he did not

---

from the federal government would be a gratuity.

**32.** We focus on the element of unreasonable delay. Any finding related to the prejudice that the government may have suffered would be speculative.

**33.** This provision does not appear in the current version of the United States Code due to the termination of the Indian Claims Commission on September 30, 1978. Indian Claims Commission Act, ch. 959, § 23, 60 Stat. 1049, 1055 (1946) (providing for the dissolution of the ICC).

recall discussing the possibility of filing a lawsuit against the government at any of the tribal council meetings during this time. Tr. 298. Further, he does not recall the tribe receiving letters from the federal government pertaining to the ICCA. Tr. 298–99. Finally, he has no recollection of the tribe hiring lawyers during this time. Tr. 299.

Bullock was on the tribal council during the years in question. He testified that while he was on the council, the tribe never hired an attorney. Tr. 304. He testified that no federal government official notified the tribe that it could file a claim against the government under the ICCA. Tr. 305–06.

The tribe also introduced an affidavit (PX V) of Clemson Sylestine given in 1974 in connection with the litigation before the ICC. Mr. Sylestine is now deceased. Mr. Sylestine was chairman of the tribal council during the years in question. His affidavit states that the tribe was not notified of the ICCA.

The government disputes the tribe's assertion that the government did not provide notice of the ICCA. The government relies on the deposition testimony of Wade Head, the Area Director for the Bureau of Indian Affairs during the years 1948 or 1949 to late 1953 or early 1954. Head had oversight responsibility for the Alabama–Coushatta Tribe. Head testified that he and the Area Solicitor, Mr. Hyden, went to the reservation while he was Area Director to notify the Indians of the Act. Tr. 237. Head testified that after he and Hyden *talked* to the Indians, "we did not feel that the Indians understood at all what we were talking about." Tr. 239. Apparently the Indians with whom they spoke felt they had no claim against the government.[34] Tr. 240. Although they recommended that the tribe consult with an attorney, they did not contact an attorney for the tribe. Tr. 241–42. Head testified that he assumed

that Hyden had written to the tribe. Tr. 242.

DX 85 contains documentary evidence (items N–1 through N–15), primarily correspondence between government officials and internal government memoranda, pertaining to the notice issue. Although *the government has not submitted a copy of a written notice provided to the tribe*, the items in DX 85 show that the government apparently made some attempt to notify the tribe. A letter from Head dated March 1, 1951 to the Commissioner of Indian Affairs states:

> A letter was written to the Alabama–Coushatta Tribe at Livingston, Texas, and to Superintendent C.H. Jones of that reservation, informing them of the final date for the presentation of claims and to ascertain whether the Tribe believes it has a claim or wishes to file a claim. To date no reply has been received.

DX 85(N–1). A letter from Head to the Commissioner dated March 26, 1951 indicated that Head intended to visit the Alabama–Coushatta reservation during the next week for the purpose of discussing a potential ICCA claim with the tribe. DX 85(N–4).

Given these facts, we find that it is unlikely that the government complied with the statutory notice provision. Although the government's evidence credibly shows that some government official may have notified the tribe of the ICCA, the evidence certainly does not show that a *written* explanation was provided to the superintendent, Jones, and the recognized head, Sylestine, of the tribe. Further, we find it troubling that the government is unable to produce a copy of a written notice. The statements of Jones, Battise, Bullock and Sylestine flatly deny that the tribe ever received notice of the ICCA. Accordingly, we conclude that the statute of limitations should not bar the tribe's claim.

---

**34.** A letter from Hyden to the Commissioner of the Bureau of Indian Affairs dated July 26, 1951 says that "[t]he officials of the Alabama–Coushatta Tribe have advised us that they have given the matter careful study and have been in communication with some attorneys and they have decided that the Tribe has no claim against the United States." DX 85(N–5). Jones, however, testified that he never informed the area office that the tribe had hired attorneys and had decided not to file a claim against the United States. Tr. 282.

## C

The third question is whether the tribe should be excused for failing to resort to an established legal remedy. The tribe's claim arises under the "fair and honorable dealings" clause of the ICCA. The ICCA provided a statutory basis for Indians to enforce aboriginal land claims arising prior to 1946 against the government.[35] In other words, the tribe's claim arose when the ICCA went into effect on August 13, 1946. The ICCA contained a five-year statute of limitations which resulted in a bar to the tribe's claim. As discussed in Part VIB, *supra,* that bar should be removed because the government failed to comply with the notice provision in the ICCA. Accordingly, the tribe's failure to resort to the only available remedy, a claim under the ICCA, should be excused.

## VII

### A

In summary, it is concluded that the plaintiff tribe had established aboriginal title to a portion of the lands claimed (the six village sites described above) by 1830 but that at no time did the tribe establish aboriginal title to the remaining portion of the modified claim area. Further, we conclude that neither the doctrine of laches nor any statute of limitations should bar the tribe's claim.

Notwithstanding these determinations, there currently remain unmodified by the review panel the conclusions of the original hearing officer, including the holding that any aboriginal title plaintiff may have possessed to the claim area was extinguished prior to the commencement of United States sovereignty over any portion of Texas. *See Battise,* 12 Cl.Ct. at 434. Consequently, there has been no occasion to conduct additional proceedings concerning precise boundaries of the village sites or to explore damages issues pertaining to the sites.

### B

This supplemental report is submitted pursuant to the provisions of 28 U.S.C. § 2509(d) and RCFC, Appendix D, paragraph 8 for further proceedings (including review and eventual transmission to the House of Representatives) pursuant to 28 U.S.C. § 2509 and RCFC, Appendix D.

### APPENDIX A

to

### SUPPLEMENTAL REPORT OF SUBSTITUTE HEARING OFFICER

Following is the text of the original report issued in the captioned matter by the Substitute Hearing Officer on March 8, 1991.

---

### REPORT OF SUBSTITUTE HEARING OFFICER

[Dated March 8, 1991]

[The report contained the following subject designations: Congressional reference; duty of review panel to "adopt or modify the findings or the conclusions of the hearing officer"; law that "hearing officer's findings shall not be set aside unless clearly erroneous"; legal status of hearing officer's report; 28 U.S.C. § 2509; RUSCC, Appendix D.]

TURNER, Judge.

### I

This congressional reference involves the claim of an American Indian tribe for compensation for loss of lands which it once occupied in eastern Texas. The case was initiated on November 29, 1983 pursuant to House Resolution 69 (98th Cong.).[1] Plain-

---

**35.** The Supreme Court has recognized that Indians have a federal common law right to sue to enforce their aboriginal land rights against parties other than the United States. *County of Oneida v. Oneida Indian Nation of New York,* 470 U.S. 226, 235, 105 S.Ct. 1245, 1251, 84 L.Ed.2d 169 (1985); *United States v. Santa Fe Pac. R.R.,* 314 U.S. 339, 342, 62 S.Ct. 248, 86 L.Ed. 260 (1941).

**1.** The reference originally involved claims of two separate but historically related American Indian tribes. The claim of the other plaintiff was treated separately and has been disposed of.

tiff's complaint was filed February 22, 1984. By order of the Chief Judge on February 28, 1984, Senior Judge Mastin White, now deceased, was appointed hearing officer to conduct proceedings and prepare a report concerning plaintiff's claim. *See* 28 U.S.C. § 2509(a) & (c); RUSCC Appendix D, ¶¶ 5, 8.

Judge White, a well-respected judge with long experience on the court, conducted proceedings which were in all respect regular and proper on their face. On September 7, 1984 he filed a comprehensive pretrial order which provided, *inter alia,* for stipulations and for pre-trial statements by the parties of issues and contentions of fact and law. Judge White presided over a four day trial (three days in Austin, Texas and one day in Washington, D.C.) during which he heard the live testimony of three expert witnesses and the deposition testimony of three other witnesses and during which more than 100 exhibits were received in evidence. After trial he established a procedure for and received from the plaintiff tribe numerous proposed findings of fact and conclusions of law.

In due course, pursuant to law (28 U.S.C. § 2509(c) & (d) and RUSCC Appendix D, ¶ 8), Judge White submitted his report on May 29, 1987. *Battise v. United States,* 12 Cl.Ct. 426 (1987). The report is comprehensive and regular on its face, setting forth detailed findings of fact and conclusions of law (including the ultimate conclusion that plaintiff tribe does not have a legal or equitable claim against the United States). Familiarity with Judge White's report is assumed.

Plaintiff filed exceptions to the hearing officer's report which were fully briefed by the parties over a period ending on December 18, 1987.

Argument pertaining to plaintiff's exceptions was conducted on April 12, 1988. On May 30, 1990, the review panel issued a half-page order, the operative paragraph of which stated:

For a brief history of proceedings related to that separate claim, see *Battise v. United States,* 12

It was the consensus of the Review Panel that Judge White had improperly applied the law on at least one critical issue, failed to address certain legal issues, and also failed to find the facts specially on several factual issues. Against this background, the Review Panel concluded that the Hearing Officer's Opinion, as written, was not acceptable in that it failed to meet the requirements of RUSCC, Appendix D, paragraph 5. The Review Panel, pursuant to RUSCC, Appendix D, paragraph 10, undertook to make use of the findings of Judge White, by modifying his conclusions and correcting his erroneous application of the law to the facts of the case. That goal, unfortunately, never came to fruition. *Members of the Review Panel could not agree upon proposed modified findings and conclusions of law. Accordingly, the case is remanded for reassignment pursuant to RUSCC, Appendix D, paragraphs 5 and 10, to a new hearing officer to be designated by the Chief Judge.* [Emphasis added.]

Defendant submitted to the review panel a motion for reconsideration of its order. *See* RUSCC Appendix D, ¶ 11. The motion pointed out with specificity that the panel's order did not discharge the responsibilities of a review panel imposed by statute and rule and suggested three alternatives to avoid legal impasse. The motion further stated: "The effect of this Order is to abandon the six years of work and effort by the parties and the Court and place the entire matter back before a Hearing Officer with no guidance from the Review Panel." Defendant's Motion for Rehearing, June 13, 1990, p. 2.

The review panel responded to defendant's motion by order dated August 6, 1990 which stated in pertinent part:

The members of the Review Panel ... discussed the findings and conclusions of the Hearing Officer and the statements of counsel presented to it at oral argument in an attempt to reach a sound

Cl.Ct. 426, 427 (1987).

conclusion. Unfortunately, the Review Panel was unable to do so because, as identified at oral argument, several key findings of the Hearing Officer were clearly erroneous, and other necessary and pertinent findings had not been made. The Review Panel sought to resolve the problems with the findings by an in-depth study to identify specific facts to construct its own separate findings and conclusions. *Id.* This task was not successful and after much thought the Review Panel was reluctantly forced to conclude that the entire matter could be properly resolved only by remand of the case to a new Hearing Officer. *Id.* On May 30, 1990 the Review Panel remanded the case for assignment to a new Hearing Officer for appropriate action.

On June 13, 1990 defendant filed it's motion objecting to the remand order. Defendant would have (1) the Review Panel identify the specific factual and legal issues upon which it could not reach majority agreement, (2) the Chief Judge appoint a new Review Panel that could perhaps reach accord on the present record, or (3) the Review Panel identify the errors in the Hearing Officer's findings and conclusions to provide guidance to the parties and the new Hearing Officer on remand.

. . . .

After consideration of the positions of the parties and its own experience with the record, the Review Panel has determined that its remand order of May 30, 1990 must stand. . . . The new Hearing Officer . . . [shall] determine how best to proceed . . . [and] make the necessary findings and conclusions. The new Hearing Officer's report will then be forwarded to the Review Panel for whatever action is necessary and proper, in accordance with Appendix D of the Rules of the United States Claims Court. The present Review Panel is of the view that it should in no way prejudice the actions of the new Hearing Officer in any manner.

The undersigned was duly appointed as substitute hearing officer by order of the Chief Judge dated February 7, 1991. (The original hearing officer died within two months after filing his report on May 29, 1987.)

## II

The orders of the review panel create a legal impasse. For reasons which follow, it is concluded that it would be unlawful for a substitute hearing officer to alter the original report (or even to take action which might lead to a modification of the original report) until a duly appointed review panel has identified deficiencies in the report and performed its legal duty to affirm or modify the original hearing officer's findings of fact and conclusions of law. To date, this has not occurred.

## III

Proceedings in congressional references cases are controlled by 28 U.S.C. § 2509 and RUSCC Appendix D. The statute provides in pertinent part:

(c) The hearing officer to whom a congressional reference case is assigned by the chief judge shall proceed in accordance with the applicable rules to determine the facts, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy. He shall append to his findings of fact conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.

(d) *The findings and conclusions of the hearing officer shall be submitted by him,* together with the record in the case, *to the review panel for review by it pursuant to such rules as may be provided for the purpose,* which shall include provision for submitting the report of the hearing officer to the parties for consideration, exception, and argument before the panel. *The panel, by*

*majority vote, shall adopt or modify the findings or the conclusions of the hearing officer.*

28 U.S.C. § 2509(c) & (d). (Emphasis added.)

RUSCC Appendix D, ¶ 8 provides as follows:

The hearing officer shall conduct such proceedings and utilize such rules of the United States Claims Court as may be required to determine the facts including facts related to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy. The hearing officer shall find the facts specially. *The hearing officer's findings shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the hearing officer to judge the credibility of witnesses.* The hearing officer shall append to the findings of fact conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant. [Emphasis added.]

RUSCC Appendix D, ¶ 10 further provides:

The findings and conclusions of the hearing officer, together with the record of the case, shall be considered by the review panel. When a party or parties have filed a notice of intention to except, the presiding officer by order shall establish a schedule for the parties to file briefs on exceptions to the hearing officer's findings and conclusions and requests for oral argument before the panel.... No case shall be returned to the hearing officer unless so ordered by the review panel. *On the basis of the entire record, the panel, by majority vote, shall adopt or modify the findings or the conclusions of the hearing officer*

*and shall file its report with the clerk....* [Emphasis added.]

The authorities quoted above plainly, emphatically and unequivocally require that a review panel either "adopt or modify" the hearing officer's findings of fact and conclusions of law. 28 U.S.C. § 2509(d); RUSCC Appendix D, ¶ 10. Before a finding of fact may lawfully be modified, a review panel must determine that it is "clearly erroneous" after affording "due regard ... to the opportunity of the hearing officer to judge the credibility of witnesses." RUSCC Appendix D, ¶ 8. The critical expert testimony in this case was given by three witnesses (Martin, Kelly and Campezzi). Trial transcript, pp. 40–689.

At the oral argument on April 12, 1988, the review panel understood its responsibilities and the standard which controlled the discharge of its duty. At the commencement of oral argument, the panel chairman stated:

As you know the standard and review is clearly erroneous. In fact, the rules ... state, 'the hearing officer's findings shall not be set aside unless clearly erroneous. And due regard should be given the opportunity of the hearing officer to judge the credibility of witnesses.'

Transcript of argument, 4/12/88, pp. 2–3. At the conclusion of argument, the panel chairman, after thanking counsel for outstanding efforts "in explaining a very complicated case in terms that I think will aid us in our understanding," stated:

At this point we do not want post hearing briefs. The record will be closed. However if during our deliberations, we identify an issue that we are not sure on, we will reopen the record [and] come back and request briefing on that, and/or arguments.

*Id.,* p. 93.[2]

## IV

The review panel has neither affirmed nor modified any of the findings of fact

---

**2.** But compare panel's rejection, by order dated August 6, 1990, of government counsel's suggestion in its motion for rehearing that the review panel "identify the specific factual and legal issues on which they could not reach agreement and ask the parties to brief them." Defendant's motion for rehearing, June 13, 1990, p. 2.

and conclusions of law of the hearing officer. It declared no factual findings to be clearly erroneous.

The panel's first order, dated May 30, 1990, stated that Judge White had improperly applied the law on at least one critical issue, but gave no hint concerning what that critical issue was. More importantly, the panel made no effort to modify the conclusion as applicable law requires. In the May 30 order, there was no suggestion that any factual findings actually made were erroneous; rather the order suggested that the facts found by Judge White were worthy of affirmance but that the report was defective by reason of "erroneous application of the law [in unspecified respects] to the facts of the case." In contrast, the panel's August 6, 1990 order stated that "several key findings of the Hearing Officer were clearly erroneous," but gave no indication concerning what those key findings might be beyond suggesting that they were "identified at oral argument." The transcript of the April 12, 1988 oral argument reflects no such determinations by the panel. Equally important, even if the panel had actually determined that several key findings were clearly erroneous, it was under the further duty to "modify" the findings. No such modification was accomplished.

Finally, concerning possible deficiencies in the hearing officer's report, the May 30 order indicated that the hearing officer had "failed to address certain legal issues" and "also failed to find the facts specially on several factual issues." The August 6 order stated that "other necessary and pertinent findings had not been made." Neither order gives any hint concerning the precise nature of the deficiencies which the panel expected a substitute hearing officer to correct.[3]

Even if the review panel had identified omissions and set forth new factual or legal issues for a substitute hearing officer to address, a new hearing officer could not properly address new issues until the panel had affirmed or modified the findings of fact and conclusions of law made by the original hearing officer. Otherwise, there would be the unacceptable danger that the new hearing officer might take action which would undermine the law of the case. *See Jamesbury v. Litton Industrial Products, Inc.*, 839 F.2d 1544, 1550 (Fed. Cir.1988) ("The law of the case is a judicially created doctrine, the purposes of which are to prevent relitigation of issues that have been decided.... The doctrine requires a court to follow the decision on a question made previously during the case"); *Raylaine Worsteds, Inc. v. United States*, 137 Ct.Cl. 54, 58 (1957) ("The general rule is that a decision by the court on a point in a case becomes the law of the case unless or until it is reversed or modified by a higher court"). *See generally Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 815–817 (1988); *United States v. Turtle Mountain Band*, 222 Ct. Cl. 1, 7–9 (1979).

Judge White held that even assuming that plaintiff at some time held aboriginal title to some land in the claim area (although his findings of fact arguably compel the conclusion that plaintiff has not established that it ever held such title), any such title had been extinguished prior to the admission of the Republic of Texas into the Union. This conclusion and its underlying facts constitute the law of the case

---

3. The sole exception is a reference in the May 30, 1990 order to RUSCC Appendix D, ¶ 5. (The reference was probably intended to be to Appendix D, ¶ 8.) Both 28 U.S.C. § 2509(c) and RUSCC Appendix D, ¶ 8 require that a hearing officer find "facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy." The hearing officer's May 29, 1987 report made no such findings presumably because they would have been superfluous in a report addressing plaintiff's claim on the merits and containing the legal conclusion that, on the merits, plaintiff "does not have a legal or equitable claim against the United States" and that any award by the United States "would be a gratuity." *Battise v. United States*, 12 Cl.Ct. 426, 434 (1987). The hearing officer would have had occasion to address issues related to plaintiff's delay only if there was a possibility of recovery on the merits.

until modified by the only group with authority to do so. In sum, the panel's orders neither affirmed nor modified any finding or conclusion of the hearing officer nor did they specifically identify any deficiency in the report. A panel's finding that a hearing officer's report is "unacceptable," or a veiled, non-specific reference to error, has no legal effect. By analogy to black-letter principle of the law of wills, which holds that a testator may not disinherit by fiat but only by leaving his property to others than his statutory heirs, a review panel may not lawfully announce, without more, that a hearing officer's report is "unacceptable" and require a completely new report. Rather, it must specifically affirm or modify findings and conclusions made by the hearing officer and identify any perceived deficiencies. The controlling statute and rule require that the panel make determinations that facts found were "clearly erroneous" before factual findings may be disturbed and requires modification of any factual findings or legal conclusions with which the panel disagrees.

## V

The most serious reason that a substitute hearing officer cannot, at this time, disturb the existing findings and conclusions of the original hearing officer, or do anything that would have the potential of variance from his ultimate conclusion (that plaintiffs have no legal or equitable claim) is that the defendant prevailed. Its position and its proof were rewarded with favorable findings of fact and conclusions of law and ultimate disposition. The position of the plaintiff was rejected. This must remain the state of things until the original report is "modified" by a duly appointed review panel, the only group which may lawfully deprive defendant of its victory at the hearing-officer level. The defendant has vested rights in the duly-arrived-at findings and conclusions already extant until they are disturbed by a duly appointed review panel.

Until these findings and conclusions are lawfully amended, it would be an unlawful interference with one party's vested rights to re-enter the case and take any action which could have the effect of changing the result arrived at by the hearing officer.

Statute and rule require that *by majority vote* the Review Panel "*shall* adopt or modify" a factual finding or legal conclusion of the hearing officer. Until this is done, it would be unlawful for any substitute hearing officer to make such modifications or to undertake a course of proceedings which could lead to disturbing the law of the case. The law is crystal clear that if a review panel disagrees with a finding or conclusion, the *panel* must modify it.[4] Only if there is an absence of findings may the matter be remanded.

In sum, there is no duty which a substitute hearing officer can perform until the review panel has discharged its statutory responsibilities regarding the original report.

## VI

The review panel has attempted to deputize another person (a substitute hearing officer) to discharge the duties which only it can lawfully perform. It may not avoid this duty because of difficulty in securing agreement of any two panel members with respect to the proper disposition of any particular factual findings or legal conclusion. Congress anticipated split panels and specifically provided that "by *majority* vote" (emphasis added), the panel shall adopt or modify findings and conclusions.

The undersigned stands ready to perform the fact-finding and other duties of a substitute hearing officer but may not lawfully do so until the review panel has complied with controlling law. Once the review panel has affirmed or modified the existing findings of the original hearing officer, a substitute hearing officer could then proceed on the basis of those previously found facts and legal conclusions which are ap-

---

**4.** A review panel may call witnesses and take evidence if necessary. 28 U.S.C. § 2509(b) ("each review panel shall have authority to do and perform any acts which may be necessary or proper for the efficient performance of their duties, including the power of subpena and the power to administer oaths and affirmations").

proved by the review panel, 28 U.S.C. § 2509(d); RUSCC Appendix D, ¶ 10, any other facts and legal conclusions modified by the review panel, *id.*, and any direction of the panel pertaining to the need for additional findings and conclusions.

If the panel is truly deadlocked to the point of paralysis and is unable to muster a majority to deal with the hearing officer's report as required by controlling law, it would appear that the only alternative is for the Chief Judge to appoint a new panel to hear exceptions to the original hearing officer's report. Thus, if the review panel is unable for whatever reason to reach a decision, it should so advise the Chief Judge so that a new review panel may be appointed to perform the review-panel duties set forth in 28 U.S.C. § 2509 and RUSCC Appendix D.

Respectfully submitted,

/s/   James T. Turner

James T. Turner, Judge
Substitute Hearing Officer

## APPENDIX B

to

## SUPPLEMENTAL REPORT OF SUBSTITUTE HEARING OFFICER

Following is the text of the Supplemental Remand Order issued by the Review Panel in the captioned matter on May 23, 1991.

---

## SUPPLEMENTAL REMAND ORDER

[Dated May 23, 1991]

Before JUDGES MOODY R. TIDWELL, Presiding Officer, and REGINALD W. GIBSON, and MARIAN BLANK HORN, Review Panel Members.

By order dated May 30, 1990, the review panel remanded this case for reassignment to a new hearing officer to be designated by the Chief Judge.[1]  Among other rea-

sons, the justification for the remand was expressed by the panel as follows:

It was the consensus of the Review Panel that [the Hearing Officer] had improperly applied the law on at least one critical issue, failed to address certain legal issues, and also failed to find the facts specially on several factual issues.... [T]he Review Panel ... reluctantly chose to remand the entire matter for new factual findings and conclusions of law.

Following the responses of the parties to the May 30, 1990 remand order, the review panel on August 6, 1990, reaffirmed its previous position.  On March 8, 1991 Judge Turner issued a document styled "Report of the Substitute Hearing Officer."  In his report, Judge Turner stated that:

(i) he would or could not proceed under the remand order "until ... the review panel has identified deficiencies in [Senior Judge White's] report, and ... affirm or modify the original hearing officer's findings of fact and conclusions of law;"

(ii) before a finding of fact may lawfully be modified, a review panel must determine that it is clearly erroneous;

(iii) there was no suggestion that any factual findings actually made were erroneous;

(iv) the review panel has neither affirmed nor modified any findings of fact and conclusions of law; and,

(v) only if there is an absence of findings may the matter be remanded.

While the panel did not detail the factual findings that the original hearing officer failed to make, it was clear from the panel's remand order that the primary reason for the remand was that he "failed to find the facts specially on several factual issues." It appears, notwithstanding the absence of detail, that the new hearing officer understood the panel's position in view of his statement that only in the absence of findings may the matter be remanded. However, when we consider the balance of his reason that he could not proceed on the

---

1.  RUSCC, Appendix D, paragraph 10, provides that "[n]o case shall be returned to the hearing officer unless so ordered by the review panel." Judge Mastin G. White, the original Hearing

Officer, died on July 25, 1987.  Upon remand the Chief Judge appointed Judge James T. Turner as Substitute Hearing Officer.

remand order, *i.e.,* "until ... the review panel ... affirm[s] or modif[ies] the original hearing officer's findings of fact and conclusions of law," it unfortunately appears that Judge Turner misperceived the position of the review panel. In any event, to obviate confusion and to expedite further proceedings, the review panel states that at this posture it has not affirmed or modified any factual findings or conclusions made by Senior Judge White and a majority found that the original hearing officer's report failed to make indispensable factual findings addressing various critical fact issues without which this panel is left to speculate whether the law has been properly applied.

The Review Panel, upon a thorough review of the record, understands why on many fact issues Senior Judge White made no findings. This is a very complex case, which brings into issue the acquisition and extinguishment of aboriginal title to approximately nine million acres in seventeen counties in the State of Texas.[2] Moreover, less than two months after he filed his May 29, 1987 Report Judge White passed away following a protracted illness. The Report was written during a critical period of his illness. Plaintiff submitted approximately 130 pages of post-trial proposed findings of fact cross-referenced to the transcript and exhibits, while on the other hand, the hearing officer's report in its entirety consisted of thirteen pages, only seven of which contained factual findings.

Paragraph 8 of Appendix D of the Rules of the United States Claims Court governing Congressional References cases provides that: "The hearing officer shall find the facts specially." Those facts, specially found, "shall not be set aside unless clearly erroneous." While the phrase "find the facts specially" is not defined in RUSCC Appendix D, it certainly means something more than simply to "find the facts." To interpret the phrase otherwise would require a finding that the word "specially" is

surplusage. The intent of the drafters was, obviously, to give a significant meaning to every word used. Because the quoted phrase is not defined in RUSCC Appendix D, it is appropriate to look elsewhere for a definition. General Rule 52 of the RUSCC contains the same language to require judges of this court to "find the facts specially." The rule also follows Rule 52 of the Federal Rules of Civil Procedure, which requires a court to "find the facts specially." In *Self v. Great Lakes Dredge & Dock Co.,* 832 F.2d 1540, 1549 (11th Cir.1987), addressed FRCP 52 as follows:

> Rule 52 requires that the trial court 'find the facts specially and state separately its conclusions of law thereon.' '[T]he findings must be specifically detailed to give [an appellate court] a clear understanding of the analytical process by which ultimate findings were reached and to assure us that the trial court took care in ascertaining the facts.' *Golf City, Inc. v. Wilson Sporting Goods Co.,* 555 F.2d 426, 433 (5th Cir.1977). 'This court cannot be left to guess. The findings and conclusions we review must be expressed with sufficient particularity to allow us to determine rather than speculate that the law has been correctly applied.' *Hydrospace–Challenger, Inc. v. Tracor/MAS, Inc.,* 520 F.2d 1030, 1034 (5th Cir.1975).
>
> Although the district court's opinion is generally careful and thorough, it does fail to make sufficient findings to permit adequate review of Self's claims for damages. A remand for appropriate findings is the normal procedure.

*See also Lewis v. Bloomsburg Mills, Inc.,* 773 F.2d 561, 576 (4th Cir.1985), wherein the Fourth Circuit, in interpreting FRCP 52, stated:

> In requiring that a bench trial court 'shall find the facts specially and state separately its conclusions of law thereon,' Fed.R.Civ.P. 52(a) does not attempt to specify the breadth or depth in which findings shall be made, nor their exact

---

**2.** The Committee on the Judiciary (Report No. 98–412) observed that—"the complicated nature of the claims and the surrounding facts warrant

referral to the Claims Court for further findings of fact."

form or style, nor their detail—whether they shall include 'subsidiary,' or 'basic,' or 'historical,' or 'ultimate,' or 'mixed' fact findings—nor any other specific quality. Appellate courts generally, and wisely, have taken a flexible view about all these matters, eschewing hypertechnicality in assessing the sufficiency of particular findings made under this wisely non-specific rule directive. *See generally* 9 C. Wright & A. Miller, *Federal Practice & Procedure: Civil § 2579.* Nevertheless, 'specially' means something in the rule's context. Basically it means sufficiently wide in scope of coverage, sufficiently deep in factual detail, and sufficiently clear in style and mode of expression to reveal to the legally-trained observer (most importantly, reviewing courts) not only the ultimate factual premises for the trial court's legal conclusions, but the basic factfinding processes by which, starting from the evidence laid before it, the court arrived at the ultimate factual premises. *See, e.g., Schneiderman v. United States,* 320 U.S. 118, 129–31, 63 S.Ct. 1333, 1338–40, 87 L.Ed. 1796 (1943); *Knapp v. Imperial Oil & Gas Products Co.,* 130 F.2d 1, 3 (4th Cir.1942).

*See also Scoggins v. Board of Education of Nashville, Ark. P. Sch.,* 853 F.2d 1472, 1477 (8th Cir.1988), which states that the purpose of FRCP 52 is "to cause the trial judge to fully.... consider the basis for his decision." Unfortunately, the review of the record and the hearing officer's report leaves a majority of the panel with the unmistakable view that the facts as found are not sufficiently wide in scope of coverage, sufficiently deep in factual detail, and sufficiently clear in style and mode of expression to reveal the ultimate factual premises for the hearing officer's legal conclusions. *Id.* at 576.

The problem was that insufficient factual findings were made "specially" of facts bearing on indispensable elements of the claim and the defense. Against this background, a majority of the review panel believes there is no impediment to a re-mand. Moreover, there is Court of Claims precedent for remand in a congressional reference case where a review panel remanded the cause for further proceedings even where the report was "accompanied by 112 pages of findings." *Alvin V. Burt, Jr. v. United States,* 199 Ct.Cl. 897, 900–901 (1972).

In congressional reference cases where a hearing officer makes proposed findings of fact and conclusions of law for the consideration of a review panel, the latter, in effect, sits as an appellate court relative to the former. This relationship, in all material particulars (except that neither has the power to enter judgment), mirrors that of the predecessor Court of Claims trial and appellate divisions. Against this background, therefore, we believe that *Northern Helex Co. v. United States,* 634 F.2d 557, 560 (Ct.Cl.1980), governs the relationship of the review panel to the hearing officer, as well as to its power. In that case, where, following remand, the trial judge failed to comply with instructions of the appellate division, former Chief Judge Friedman stated:

> It is 'familiar doctrine that a lower court is bound to respect the mandate of an appellate tribunal....' [citation omitted] '[A]n inferior court has no power or authority to deviate from the mandate issued by an appellate court.' [Citation omitted.] ... That court cannot vary it, or examine it for any other purpose than execution; ... or review it, even for apparent error....' [Citation omitted.]

In the Report of Substitute Hearing Officer (at pp. 5–7, 9–10), dated March 8, 1991, following this panel's remand order of May 30, 1990, and general order dated August 6, 1990, Judge Turner stated:

> The orders of the review panel create a legal impasse. For reasons which follow, it is concluded that it would be unlawful for a substitute hearing officer to alter the original report (or even to take action which might lead to a modification of the original report) until a duly appointed review panel has ... performed its legal duty to affirm or modify the original hearing officer's findings of fact

and conclusions of law. To date, this has not occurred.

\* \* \* \* \* \*

Before a finding of fact may lawfully be modified, a review panel must determine that it is 'clearly erroneous' after affording 'due regard ... to the opportunity of the hearing officer to judge the credibility of witnesses.'

\* \* \* \* \* \*

The review panel has neither affirmed nor modified any of the findings of fact and conclusions of law of the hearing officer. It declared no factual findings to be clearly erroneous.

\* \* \* \* \* \*

[A] new hearing officer could not properly address new issues until the panel had affirmed or modified the findings of fact and conclusions of law made by the original hearing officer. Otherwise, there would be the unacceptable danger that the new hearing officer might take action which would undermine the law of the case. *See Jamesbury v. Litton Industrial Products, Inc.,* 839 F.2d 1544, 1550 (Fed.Cir.1988).

\* \* \* \* \* \*

The most serious reason that a substitute hearing officer cannot, at this time, disturb the existing findings and conclusions of the original hearing officer, or do anything that would have the potential of variance from his ultimate conclusion (that plaintiffs have no legal or equitable claim), is that the defendant prevailed.... This must remain the state of things until the original report is 'modified' by a duly appointed review panel.... Until these findings and conclusions are lawfully amended, it would be an unlawful interference with one party's vested rights to re-enter the case and take any action which could have the effect of changing the result arrived at by the hearing officer.

Unquestionably, all of the foregoing issues identified by the substitute hearing officer were laid to rest by the recent Court of Appeals for the Federal Circuit decision in *Exxon Corporation v. United States,* No. 90–5152, decided on April 30, 1991. The threshold issue decided by Circuit Judge Michel was:

Whether a substitute trial judge (Chief Judge Smith), on remand from the appellate court, may revisit, revise, modify, and/or supplement the findings of fact made by the predecessor trial judge where the appellate court has not previously passed on such factual findings in arriving at its decision ... [and] ... [w]hether the dispositive findings and conclusions of the predecessor trial judge became the law of the case and thus were not subject to further revisions?

Addressing the last issue first the substitute hearing officer contends that Judge White's findings of fact and conclusions of law are an absolute bar upon him, citing to *Jamesbury Corp. v. Litton Industrial Products, Inc.,* 839 F.2d 1544 (Fed.Cir.), *cert. denied,* 488 U.S. 828 (1988). We embrace the responsive admonishment by Judge Michel that "[t]his argument misapprehends the scope and meaning of the law of the case doctrine." *Exxon,* slip op. at 6. This is so, he holds, because it is "the decision of the appellate court [that] determines the law of the case." Judge Michel explained that:

Law of the case, then, merely requires a trial court to follow the rulings of an appellate court. [Footnote omitted.] It does *not* constrain the trial court with respect to issues not actually considered by an appellate court, *Holcomb v. United States,* 622 F.2d 937, 940 (7th Cir. 1980), and thus has long been held not to require the trial court to adhere to its own previous rulings if they have not been adopted, explicitly or implicitly, by the appellate court's judgment. *See Quern v. Jordan,* 440 U.S. 332, 347 n. 18 (1979) ('The doctrine of law of the case comes into play only with respect to issues previously determined.... "While

a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues." ' [3] (Quoting *Sprague v. Ticonic Nat'l Bank,* 307 U.S. 161, 168 (1939)). [Footnote omitted.] We hold that when a judgment has come before us for review, and certain findings of fact were not examined in, relied on, or otherwise necessary to our decision in that appeal, law of the case does not prevent the trial court on remand from reexamining those findings, with no more deference than if the decision had never been appealed at all. Accordingly, ... the Claims Court in this case remained free to amend its earlier finding of fact.

Since it is clear that the law of the case doctrine is inapposite to the facts here it follows that the answer to the first issue is in the affirmative. Therefore, the substitute hearing officer shall make the following factual findings and legal conclusions that Senior Judge White failed to make: [4]

A. *THE CLAIM AREA:* Make findings of fact as to—

(i) the boundaries of the claim area (*i.e.,* number and identity of the counties within the claim area)

(ii) the gross number of acres in the claim area

    a.  prior to December 29, 1845, and

    b.  on and after December 29, 1845

(iii) the gross number of acres in each of the counties within the claim area

    a.  prior to December 29, 1845, and

    b.  on and after December 29, 1845.

B. *ESTABLISHMENT OF ABORIGINAL TITLE:* After 1800 and before December 29, 1845, make findings of fact as to—

(i) whether the tribe ever exercised actual, continuous, and exclusive use and occupancy for a long time over any land in the claim area;

(ii) if affirmative, make findings of fact as to—

    a.  the first year;

    b.  The identity of the county or counties within the claim area where aboriginal title was established, and

    c.  the total acreage so occupied within each year after that first year.

(iii) each year after the first year and until December 28, 1845, whether the tribe exercised actual, continuous, and exclusive use and occupancy for a long time over any other areas within the claim area.

(iv) if affirmative, make findings of fact for each year after the first year until December 28, 1845, as to—

    a.  the identity of the county or counties within the claim area so occupied each year, and

    b.  the total acreage occupied within each county each year

(v) if the tribe acquired aboriginal title within the claim area prior to December 29, 1845, make findings of .fact as to—

    a.  the total number of acres so established

    b.  all of the counties in which aboriginal title was established

(vi) whether any other tribes established aboriginal title in the claim area

(vii) if (v) affirmative, also make findings of fact as to—

    a.  the name(s) of the tribe(s);

---

**3.** *See also* 1B J. Moore, J. Lucas & T. Currier, *Moore's Federal Practice* para. 0.404[1] at 118 (2d ed. 1988) (footnotes omitted):

A court that makes a decision has the *power* to reconsider it, so long as the case is within its jurisdiction. But after the law of the case is determined by a superior court, the inferior court lacks authority to depart from it, and any change must be made by the superior court that established it, or by a court to which it, in turn, owes obedience.

**4.** The substitute hearing officer shall not consider the requested findings to constitute a limitation as to the scope of his findings, but rather such shall be deemed to constitute the bare minimum. Therefore, the hearing officer shall make such additional factual findings and conclusions as the exigencies of the circumstances may warrant. All such supplemental findings of fact shall be serially numbered and cross-referenced to the transcript and exhibits.

b. the county or counties in which aboriginal title was so established;

c. the total acreage in each county in which aboriginal title was established;

d. the year(s) of establishment;

e. the facts supporting the conclusion.

C. *EXTINGUISHMENT OF ABORIGINAL TITLE:* [5] On and after December 29, 1845 (except as otherwise noted)—

(i) make findings of fact as to whether any of the following tribes held aboriginal title to land in any counties in the claim area on December 29, 1845:

| a. | indigenous Indians | –Hasinai |
| | | –Bedias |
| | | –Orcoquizac |
| b. | non-indigenous Indians | –Beloxi |
| | | –Choctaws |
| | | –Pakana Muskogoges |

(ii) if affirmative, make findings of fact as to each tribe with respect to the following:

a. the county or counties in which aboriginal title was so held;

b. the number of acres in each county aboriginal title was held;

c. the dates on which each establishment and each extinguishment of aboriginal title occurred in each county;

d. the manner of extinguishment.

(iii) make the following findings of fact, not previously made by Senior Judge White, as to all extant land grants within the claim area on or before December 28, 1845, including:

a. the date(s) of the grant(s);

b. the location (county or counties in the claim area) of the grants;

c. the total acreage on each grant in the claim area; and

d. the aggregate acreage on all grants in the claim area.

(iv) make findings of fact as to all land grants within the claim area on and after December 29, 1845, as to the following:

a. the date(s) of the grant(s);

b. the location (county or counties in the claim area) of the grants;

c. the total acreage on each grant in the claim area.

(v) make findings of fact, if aboriginal title is established in any particular county or counties in the claim area, whether such title was at any time extinguished by sword, treaty, purchase, or the complete dominion and control adverse to the tribe, and in particular the following as to each incident: [6]

a. the date(s);

b. the location of the land (by county or counties) in the claim area;

c. the total acreage extinguished in each county in the claim area as of December 28, 1845, and after December 29, 1845;

d. all necessary facts supporting the legal conclusion.

D. *THE CLAIM AREA AFTER TEXAS BECAME PART OF THE UNION ON DECEMBER 29, 1845:* Make findings of fact as to—

(i) the total acreage, if any, in each county in the claim area in which the Tribe held aboriginal title on December 29, 1845.

(ii) if the response to (i) is affirmative,

a. how, on and after December 29, 1845, the Tribe lost aboriginal title to all or any such acreage in each county in the claim area;

b. the date(s) on which the facts found support a legal conclusion that the Tribe's aboriginal title to all such

---

5. Extinguishment "cannot be lightly implied," *United States v. Santa Fe Pacific R.R. Co.,* 314 U.S. 339, 354 (1941); moreover, with respect to government action absent a " 'clear and plain indication' in public records that the sovereign intended to extinguish [aboriginal title] ... ,' Indian title continues." *The Lipan Apache Tribe etc. v. United States,* 180 Ct.Cl. 487, 492 (1967).

6. Once aboriginal title is established, "the Government not the tribe ... [has] the burden of showing its extinguishment by any particular date." *Plamondon ex rel. Cowlitz Tribe v. United States,* 199 Ct.Cl. 523, 531, 467 F.2d 935, 939 n. 2 (1972).
*Cowlitz Tribe v. United States,* 199 Ct.Cl. 523, 531, 467 F.2d 935, 939 n. 2 (1972).

lands in the claim area had been legally extinguished after December 28, 1845.

(iii) any other appropriate factual finding(s) required by the foregoing new findings of fact, including but not limited to the findings required by paragraph 8, Appendix D, RUSCC.

## E. *SCOPE OF H.R. 1232:*

If enacted, the bill would authorize the payment of money out of the Treasury of the United States for the benefit of the Tribe:

in full settlement of all claims of the said ... Tribes of Texas ... arising from ... claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity, and other claims which otherwise ... would have been compensable under the Indian Claims Commission Act, section 70 of title 25 U.S.C.

In addition to the required factual findings there are legal issues which the original hearing officer should have addressed, but did not. Consequently, the following legal issues should also be appropriately addressed by the hearing officer:

(i) whether the relationship between the Tribe and the United States imposed an obligation of fair and honorable dealings over all lands, if any, as to which petitioner held aboriginal title on December 29, 1845;

(ii) whether the alleged failure to protect the Tribe in possession of aboriginal lands, after December 29, 1845 (if found as a fact) is a breach of the United States' fiduciary duty;

(iii) if the additional factual findings entitle petitioner to relief—

(a) the proper measure of damages for any such breach of trust, and

(b) the identification and extent of any permissible offsets; and

(iv) any other appropriate legal issues required by the new findings of fact.

Having "identified the deficiencies in the report" and upon compliance with this remand order by the substitute hearing officer, the review panel will consider "the findings and conclusions of the hearing officer together with the record" as required by Paragraphs 5 and 10, Appendix D, RUSCC.

Should the Substitute Hearing Officer determine upon his review of the record that, as a matter of law and fact, any one or more of the above-identified findings are not relevant to the specific findings of fact required by this remand order, he shall so state the reasons why each particular finding was not made. To minimize the possibility of a second remand, the review panel urges caution in the exercise of this exception to meet the requirements of RUSCC App. D, Paragraph 8.

IT IS SO ORDERED.

/s/ Moody R. Tidwell
MOODY R. TIDWELL
Presiding Officer

/s/ Reginald W. Gibson
REGINALD W. GIBSON [7]
Review Panel Member

/s/ Marian Blank Horn
MARIAN BLANK HORN
Review Panel Member

---

7. This Panel Member excepts only to the inclusion of the word "exception" in the last sentence on page 13 with regard to RUSCC App. D, Paragraph 8.